No. 23,901.

THE FARMERS STATE BANK OF KINGMAN, *Appellee*, v. JOE PICKERING, AND MRS. JOE PICKERING, His Wife, *Appellants*.

### SYLLABUS BY THE COURT.

1. PROMISSORY NOTES—*Given for Money Borrowed to Purchase Land—Lien for Purchase Money.* The findings of fact to the effect that the plaintiff bank furnished the money evidenced by the notes sued on to purchase the land in question, under an agreement that it would be secured therefor, and that the amounts furnished amounted to one transaction, are held to be sustained by the evidence.

2. SAME—*Lien for Purchase Money—Homestead Rights.* Under section 9, article 15 of the constitution, if the money was lent and used for the purpose of purchasing the land in question and thereafter occupied as a homestead, it would not be exempt from sale for the payment of such debt.

Appeal from Harvey district court; WILLIAM G. FAIRCHILD, judge. Opinion filed April 8, 1922. Affirmed.

*Carr W. Taylor, John H. Connaughton,* both of Hutchinson, *Ezra Branine,* and *Alden E. Branine,* both of Newton, for the appellants.

*Charles C. Calkin,* of Kingman, and *H. W. Hart,* of Wichita, for the appellee. ·

The opinion of the court was delivered by

WEST, J.: The plaintiff sued the defendant, Joe Pickering, on two notes, one for $8,700 and the other for $560.87. Thereafter, Pickering filed a voluntary petition in bankruptcy, and the plaintiff filed an amended petition making Mrs. Pickering a party defendant, alleging that the money for which the notes were given was lent to the defendants upon an agreement to mortgage the land involved therein, and further averring an agreement with the de-

Bank v. Pickering.

fendants that if the plaintiff would furnish them with the necessary funds to purchase this land they would, as soon as they acquired title, make a mortgage to secure the money; and prayed for a decree adjudging the money due as an obligation contracted in payment for the purchase price of the land.

The court gave the plaintiff judgment for $9,700 and interest and found as a conclusion of law that the indebtedness was contracted for the real estate in question and that such real estate was not exempt from sale under execution for the payment of such obligation.

Sixteen findings of fact were also made by the court and the defendants claim that numbers 3, 5, 6, 9 and 15 were erroneously made, and say:

"This is the only question in this case. These findings all taken together really mean: 'That the indebtedness sued upon in this action was for money loaned by the bank to the defendant, Joe Pickering, under an agreement that it should be used for the purchase of the land in question.'"

It is argued that these findings are practically conclusions of law and are not supported by the evidence. These five findings were to the effect that before the purchase of the land the defendant, Joe Pickering, conferred with Callahan, the president of the bank, about the purchase of certain other land in the same vicinity and they went together to look over such land and afterwards Callahan told Pickering that in case he bought land in that vicinity he could have such funds as he might need in addition to what he had; that immediately afterwards Pickering contracted for this land and advised the bank of the purchase and its terms:

"And it was agreed between said defendant, Joe Pickering and the bank through its president, J. E. Callahan, that said bank would loan the said defendant such money as he might need to complete the purchase of the said real estate."

Further, that on May 19, 1919, he advised the bank that he had issued a check for $5,000 to cover the amount due on approval and that he would need $3,500, which the bank agreed to lend him, to meet the payment on the real estate, and for which Pickering gave his note. That on August 2, 1919, he advised the bank that he expected to close the deal in a few days and needed more money, the balance due being $14,000, and that he needed $4,500 to make the final payment, "which amount the bank loaned him for the purpose," and on August 5, he gave his check for $14,000 as final payment on the land. That the $3,500 item of May 19, and the $4,500 one of August 2, were borrowed on agreement between Pickering and the

plaintiff and was lent by the bank to pay the purchase price of the real estate involved in this case, and was so used.

"And the use of said money in making payments for said real estate were all parts and portions of one single and entire transaction."

We think these findings are findings of fact rather than conclusions of law, and a careful examination of the abstract and counterabstract furnishes fair support for each of them. It appears that Pickering had done business with the bank for a long while, sometimes borrowing large sums and often overdrawing, and that a practice had grown up that when he was away from home and needed money, some one in the bank would advance the money and sign his name to a note, and when he came in such notes would be put into a new one properly signed by himself. It is clear from the evidence that he talked with the officers of the bank about the purchase of this land and told them of his contract and that he needed more money than he had, and that a loan of some $10,000 was secured from a loan company and placed to his credit in the bank.

The vice president testified that on August 2, when the $10,000 was placed to his credit, Pickering's balance was $14,487.63, and the $14,000 check was given to pay the remainder of the purchase price on the land.

"He told me about buying and selling this land. . . . He said he would buy another piece of land if we boys would help him; that is, he couldn't do it alone. . . .

"Q. How often did he talk to you about financing this deal for the purchase of this real estate? A. Very frequently.

"Had several conversations with Pickering in reference to the buying of this land, and the bank loaned him the money. . . . Probably discussed it a half dozen times. . . . The reason no mortgage was ever taken was that Pickering deferred doing so from time to time, stating that he expected to sell the land and pay up."

Mr. Callahan, president of the bank, testified that Pickering wanted to know what he thought about buying the farm there and if the bank would lend him some money.

"I told him that the land was going to cost him a good bit of money and the only way we could handle it was to get a real estate loan through for as much as he could get from some mortgage company and we would loan him the balance from the bank. . . .

"A. He said we could hold the deed or a mortgage or fix it up any way we wanted to. He said he couldn't buy the land without our help, which was true. . . .

"A. Well, he said it was going to cost around $20,000, somewhere along there. . . .

"A. Well, he said he didn't have only about $4,000, and he wanted to know if there was any way he could fix it up if he made the deal. . . .

"A. I told him to go ahead and make the deal and I would get him a real estate loan for all I could and I would take care of the balance at the bank for him. . . .

"A. Well, I told him we could fix it up with a mortgage or fix, it up some way later on. To go ahead and make the note or have the boys make the note at the bank for what he needed to finish up his deal, and we would fix up the mortgage later on."

He further stated that the mortgage for $10,000 was signed up at the bank, and it was agreed that Pickering—

" 'Could put up his notes at the bank, what he needed to clean it up, and we would fix it up later on,' and not take a mortgage just then, as Pickering said he might sell it in a few days."

It is impossible to read the record without coming to the conclusion that the bank furnished the money to buy this land and that Pickering could not have bought it without the assistance of the bank. The controversy arises now over the claim of the Pickerings that the land constitutes their homestead, which cannot be reached by the bank for the collection of its debts. The record, however, is convincing that the findings of fact complained of were fairly supported by the evidence.

It is contended that there must have been such an agreement between all the parties as could subrogate the bank to the rights of Kiser, from whom the land was purchased. But the case turns, not on a question of subrogation, but on the question whether the money was lent by the bank to buy the land, and used for such purpose. If so then the lender is entitled to a judgment, and in such judgment he may attach the land because under the constitution it is not exempt from sale "for the payment of obligations contracted for the purchase of said premises." (Art. 15, § 9; *Andrews v. Alcorn, Adm'r, &c,* 13 Kan. 351; *Nichols v. Overacker,* 16 Kan. 54; *Greene v. Barnard,* 18 Kan. 518; *Tyler v. Johnson,* 47 Kan. 410, 28 Pac. 198; *King v. Wilson,* 95 Kan. 390, 394, 148 Pac. 752; Thompson on Homesteads and Exemptions, §§ 339-342; Smyth on Homestead and Exemptions, § 223; Waples on Homestead and Exemption, 331.)

"Money borrowed of a third person by the vendee of a homestead, and paid to the vendor, is purchase-money for which the purchased property is liable to such third person, under the broad application of the term *purchase-money* in many of the homestead states." (Waples on Homestead and Exemption, 337.)

The judgment is affirmed.