No. 44,555

MACKEY-WOODARD, INC., *Appellant,* v. CITIZENS STATE BANK OF CHENEY, *Appellee,* and ELMA JEAN MACKEY, *Third Party Defendant.*

(419 P. 2d 847)

Opinion filed November 5, 1966.

*Thomas A. Wood,* of Wichita, argued the cause, and *Paul V. Smith, Douglas E. Shay, William C. Farmer, Leo R. Wetta, James R. Schaefer,* and *Larry L. Witherspoon,* all of Wichita, were with him on the brief for the appellant.

*Robert C. Foulston* and *Benjamin C. Langel,* both of Wichita, argued the cause, and *George B. Powers, Carl T. Smith, John F. Eberhardt, Stuart R. Carter, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris, Gerald Sawatzky, Donald L. Cordes, Robert L. Howard, Charles J. Woodin, Mikel L. Stout, Donald K. Badger* and *Phillip S. Frick,* all of Wichita, were with them on the brief for the appellee.

*Eugene G. Coombs, William H. Dye* and *John M. Reiff,* all of Wichita, were on the brief for the third party defendant.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action by the corporate payee of a check to recover the proceeds of the check in the sum of $22,879.62 with interest from a collecting bank which cashed the check and procured payment thereof from the drawee bank upon an unauthorized indorsement of the corporate payee. Appeal has been duly perfected from an order of the trial court which sustained the collecting bank's motion for involuntary dismissal at the close of the plaintiff's evidence on the ground that the action was barred by the two-year statute of limitations. (K. S. A. 60-513.)

The basic question on appeal is whether the petition and the plaintiff's evidence presented pursuant thereto are sufficient to permit recovery on the theory of contract.

If the answer to the foregoing question is in the affirmative, the three-year statute of limitations under K. S. A. 60-512 is applicable

and the action is not barred. On the other hand, if the answer is in the negative and the nature of the action sounds in tort, or must be founded on a tort theory, the two-year statute of limitations under 60-513, *supra*, is applicable, and the action is barred because it was not commenced within two years after it accrued.

The petition filed on the 22nd day of June, 1964, in the district court of Sedgwick County reads:

"1. On July 6, 1961, Frank C. Brosius.Co., Inc., drew a check on the Fourth National Bank & Trust Company, payable to the order of the plaintiff in the amount of $22,879.62.

"2. On about July 6, 1961, Charles A. Mackey, who was then the President of the plaintiff corporation, received the check and without authority, endorsed it 'Mackey-Woodard, Inc., Charles H. Mackey', and without authority deposited the check to his personal account in the defendant, Citizens State Bank of Cheney.

"3. On about July 6, 1961, the defendant, Citizens State Bank of Cheney accepted the check from Charles H. Mackey and placed it to his personal credit. In the due course of banking business, the check was paid by the drawee, Fourth National Bank & Trust Company and the defendant, Citizens State Bank of Cheney collected the check and placed the $22,879.62 in proceeds thereof in the personal account and to the personal credit of Charles H. Mackey.

"4. Thereafter, the defendant, Citizens State Bank of Cheney applied the proceeds of the check to the payment of checks drawn by Charles H. Mackey personally for the personal benefit of Charles H. Mackey. The defendant thereby misappropriated the proceeds and converted them to the personal use of Charles H. Mackey.

"5. The defendant accepted and collected the check with notice that the check and the $22,879.62 in proceeds thereof were the property of the plaintiff and the defendant with such notice, deposited the check and placed its proceeds to the personal credit and account of Charles H. Mackey and converted the proceeds to the personal use of Charles H. Mackey.

"6. The conversion of the proceeds of the check was concealed from the plaintiff by Charles H. Mackey and the defendant and did not become reasonably ascertainable to the plaintiff until the death of Charles H. Mackey on February 14, 1963.

"7. On June 18, 1964, plaintiff duly demanded payment of the sum of $22,879.62 from the defendant, but no part thereof has been paid.

"Wherefore, plaintiff demands judgment against defendant in the amount of $22,879.62 together with interest at the rate of 6% per annum from July 6, 1961 together with the costs of this action."

The answer, among other things, alleged the plaintiff's claim was barred by the statute of limitations.

The issue on appeal is focalized in the petition. And for purposes of our review it may be said the plaintiff's evidence and the

findings of the trial court, except as hereinafter noted, establish the allegations of the petition.

The pertinent facts giving rise to the transaction in question may be summarized as follows:

At the time Mackey-Woodard, Inc. (plaintiff-appellant) was organized as a corporation in 1960, Charles Mackey was and had been a real estate developer and operator. Gail Woodard was a wealthy farmer and had cash to loan and invest. These men had in the past been engaged in various financial dealings. They together with their wives, organized the corporation in question and designated the officers to be Charles Mackey, president; Gail Woodard, vice-president; Elma Jean Mackey (wife of Charles), secretary; and Jean Esther Woodard (wife of Gail), treasurer.

Mackey conveyed his equity in two shopping centers, "Maple Villa" and "Maize Shopping Center," in the Wichita area to the corporation in return for one-half of the common stock; and Mr. and Mrs. Woodard paid $60,000 in exchange for their one-half of the stock. At the time of incorporation, there was an existing mortgage on the Maple Villa Shopping Center held by Frank Brosius, Inc. in the approximate amount of $40,000 to $45,000. After the Maize Shopping Center was put in the corporation it was mortgaged to Gail Woodard for $50,000, but Woodard failed to record this mortgage. Both mortgages were entered on the books of the corporation.

Mackey, apparently aware that Woodard had failed to record his mortgage, then arranged a loan with the Frank Brosius Co., Inc. for $45,000 to be secured by a first mortgage on the Maize Shopping Center. The mortgage was executed by Charles Mackey, president, and his wife as secretary, and dated June 22, 1961.

On the first day the corporation did business, March 1, 1960, it issued numerous checks for large amounts to various persons, including a check to the defendant bank, a personal creditor of Mr. Mackey, in the amount of $12,000. The corporation did not owe any money at the time. It appears from the record that the corporation was thoroughly entwined with the financial affairs of its incorporators wherein Mackey was in complete charge of operations with Woodard playing the part of the financial angel. Woodard testified that he trusted Mackey one hundred percent.

While Mrs. Woodard, after the first month, kept the books of the corporation, all rents and moneys due the corporation were collected by Mackey, and it was his responsibility to deposit corporate funds

to the account of the corporation at the Wichita State Bank. It was from the deposit slips and the checks run through the Wichita State Bank that Mrs. Woodard kept the accounts on the corporate books.

The corporate account at the Wichita State Bank required two signatures—Charles Mackey, president, and Esther Jean Woodard, treasurer.

Mr. Mackey stopped at the Woodard's home several times a week, always in a hurry, according to the testimony of Mr. Woodard, and sometimes had papers for them to sign. The record discloses that among the papers signed by the Woodards was the real estate mortgage note on the Maize Shopping Center to the Brosius Company dated June 22, 1961, upon which Mr. and Mrs. Woodard signed as guarantors.

The corporate minutes, however, do not reflect any authorization for the mortgage to the Maize Company on the Maize Shopping Center.

On July 6, 1961, Brosius drew a check payable to the order of Mackey-Woodard, Inc. in the amount of $22,879.62, this being a part of the $45,000 loan on the Maize Shopping Center. On the same date Charles Mackey indorsed the check "Mackey-Woodard, Inc., Charles H. Mackey," and deposited the check to his personal account in the Citizens State Bank of Cheney (defendant-appellee). The Citizens State Bank of Cheney accepted the check, collected upon it, and placed the proceeds to the personal credit of Charles Mackey in his personal account.

On the same day, July 6, 1961, the Citizens State Bank accepted $15,101.10 of the proceeds of the check in payment of a personal note of Mackey to the Citizens State Bank of Cheney. Mackey in due course applied the balance of the proceeds in his account at the Citizens State Bank of Cheney to his personal use.

The mortgage to Brosius on the Maize Shopping Center was never entered on the books of the corporation, and the corporation received none of the proceeds of the loan; neither the corporation nor the Woodards made any payment on the loan. Mr. Mackey died in February, 1963, and Mr. and Mrs. Woodard bought Mackey's stock in the corporation from his estate. After Mackey's death the corporation paid off the Brosius loan on the Maize Shopping Center, which Mr. Mackey had personally paid down some $2,500 prior to his death.

On the 22nd day of June, 1964, this action was filed against the

Citizens State Bank of Cheney, and upon subsequent motion Elma Jean Mackey was joined as a third party defendant.

Both Mr. and Mrs. Woodard testified the first knowledge they had that Brosius had a loan on the Maize Shopping Center was after the death of Charles H. Mackey. Mrs. Mackey likewise testified that her first knowledge of the Brosius loan on the Maize Shopping Center was after Mackey's death.

The trial court found upon the evidence that the corporation, Mackey-Woodard, Inc., through its officers, Gail Woodard, Jean Esther Woodard and Elma Jean Mackey, all of whom signed the real estate mortgage note, either knew or could have reasonably ascertained no later than August 31, 1961, that the check which forms the basis of the instant action had been issued payable to Mackey-Woodard, Inc.; that the proceeds of such check were not deposited in any bank account of Mackey-Woodard, Inc. and that the proceeds of such check were deposited in the account of Charles H. Mackey, by reason of which the trial court held the action commenced on June 2, 1964, was barred by the two-year statute of limitations. It concluded the action was "for the alleged conversion by the defendant *of the proceeds* of a check issued to the plaintiff." (Emphasis added.) Thereupon, the court, having heard this matter without a jury, sustained the defendant bank's motion for involuntary dismissal of the action at the close of the plaintiff's case.

The vast majority of the cases in this country hold, in the absence of negligence, laches or estoppel, that a collecting bank which cashes a check on a forged or unauthorized indorsement of the payee, and procures the proceeds thereof from the drawee, is liable to the payee who is the true owner of the check.

This precise situation was before the Kansas Supreme Court in *Vacuum Cleaner Co. v. Bank*, 101 Kan. 726, 168 Pac. 870, and the court held the collecting bank liable to the payee for the proceeds of the check. However, the theory upon which the plaintiff was permitted to recover was not mentioned in the opinion.

It is clear in the instant action that title to the check remained in Mackey-Woodard, Inc., the payee. The applicable statute is contained in the Uniform Negotiable Instruments Law, K. S. A. 52-223. It provides:

"Where a signature is forged or made without authority of the person whose signature it purports to be, it is wholly inoperative, and no right to retain the instrument, or to give a discharge therefor, or to enforce payment thereof against

any party thereto, can be acquired through or under such signature, unless the party against whom it is sought to enforce such right is precluded from setting up the forgery or want of authority."

Here the collecting bank on the unauthorized indorsement of Charles Mackey acquired no title whatever to the check because the indorsement, its only source of title, was a nullity. The collecting bank was therefore wrongfully in possession of the check and in equity and in good conscience held it for the payee. (*Lindsley et al., Aplnts., v. First Nat. Bank*, 325 Pa. 393, 190 Atl. 876 [1937]; and *Henderson v. Lincoln Rochester Trust Co.*, 303 N. Y. 27 [1951].)

The legal authorities in this country are divided in cases of this kind as to the theory which forms the basis of recovery. This point is the subject of a recent annotation appearing in 100 A. L. R. 2d 670, where the cases are accumulated and classified on the basis of the particular theory advanced by the courts as the basis of recovery. This annotation supersedes 31 A. L. R. 1063, 1068; and 67 A. L. R. 1535.

Cases which have permitted recovery under the tort theory reason that the collecting bank in receiving a check for collection gets no title to the check, if the holder depositing it had none; by collecting it, and crediting the collection to the depositor, the bank necessarily assumes dominion over the check inconsistent with the payee's control over his own property—this is a conversion. (*Lindsley et al., Aplnts., v. First Nat. Bank*, supra.)

It is said the validity of the check, the scope of the order to pay and the person authorized by the drawer to receive payment are fixed at the inception of the instrument. It is therefore presumed that the payee of a check is its owner. Much of the very purpose of the Uniform Negotiable Instruments Law would be perverted if courts permitted a payee, or owner of an instrument, to be contested by extraneous evidence of a claim to the proceeds. The damages for the conversion of a negotiable instrument are *prima facie* its face value. (*Good Roads Machinery Co. v. Broadway Bank*, 267 S. W. 41 [Mo. Ct. App. 1924]; *Aetna Casualty & Surety Co. v. Lindell Trust Co.*, 348 S. W. 2d 558 [Mo. Ct. App. 1961]; and *Moch Co. v. Security Bank*, 176 N. Y. App. Div. 842 [1917].)

Other cases which permitted recovery on the theory of tort for conversion are *California Stucco Co. v. Marine Nat. Bank*, 148 Wash. 341, 268 Pac. 891 (1928); *Elwert v. Pacific First Federal Savings & Loan Ass'n*, 138 F. Supp. 395 (D. Or. 1956); *Gresham State Bank*

*v. O & K Con.*, 231 Or. 106, 370 P. 2d 726, 372 P. 2d 187 (1962); *Security Fence Co. v. Association*, 101 N. H. 190, 136 A. 2d 910 (1957); and *Hillsley v. State Bank of Albany*, 230 N. Y. S. 2d 531, 17 A. D. 2d 686 (1962).

Most of the leading cases which permit recovery upon the contract theory recognize the conversion but go on to reason beyond the conversion. It is said if the collecting bank, while it is in possession of a check which it has converted, by means of the forged or unauthorized indorsement collects on it from the bank upon which it is drawn (drawee), then the collecting bank holds the proceeds of the collection in the same way for the payee as it held the check, and that relationship creates a privity between the collecting bank and the payee. If under these circumstances the payee elects to ratify the collection of the check by the collecting bank, he may recover from it the amount collected as for money had and received without regard to any question of good faith, or of notice or knowledge or duty of inquiry, notwithstanding the fact that the collecting bank may have parted with the money in good faith. (*Moch Co. v. Security Bank*, supra.)

Stated in other words, a collecting bank is said to be merely an agent for the purpose of collecting from the drawee bank the proceeds of the check delivered to it. When it takes the check for collection, it assents to the agency and becomes bound by the terms of the instrument received. Those terms include an obligation to pay the proceeds collected to the true payee owner *in the absence of a valid indorsement*. The moment the collecting bank receives the proceeds it holds money belonging to the owner of the check and becomes a debtor of such owner and of no one else, in the absence of a valid indorsement. (*Henderson v. Lincoln Rochester Trust Co.*, supra.)

The rule is firmly established that one who acts upon the indorsement of negotiable paper must ascertain the genuineness of the indorsement at his peril. (*California Stucco Co. v. Marine Nat. Bank*, supra; and *Independent Oil Men's Ass'n v. Bank*, 311 Ill. 278, 142 N. E. 458 [1924].) It is no defense to a collecting bank that it has fully paid over and accounted for the proceeds of a check, which it collected from the drawee bank, to the forger or unauthorized indorser without knowledge or suspicion of the forgery or unauthorized indorsement in a suit by the payee for money had and received. (*United States Co. v. U. S. Bank*, 61 Colo. 334, 157 Pac.

202 [1916], and cases cited therein; *Water Co. v. Bank*, 123 Tenn. 364, 131 S. W. 447 [1910]; *Buckley v. Second National Bank of Jersey City*, 35 N. J. L. 400, 10 Am. R. 249 [1868]; *Shaffer v. McKee*, 10 Ohio St. 526 [1869]; *Johnson v. First Nat. Bank*, 6 Hun. 124 [N. Y. 1875]; *Graves v. The American Exchange Bank*, 17 N. Y. 205 [1858]; *The Indiana National Bank v. Holtsclaw et al.*, 98 Ind. 85 [1884]; *Carloading & Distributing Co. v. South Side Bank*, 224 Mo. App. 876, 27 S. W. 2d 768 [1930]; and *George v. Security Trust & Savings Bank*, 91 C. A. 708, 267 Pac. 560 [1928].)

Many of the states in which vast commercial transactions are handled (New York, Pennsylvania, Illinois, New Jersey, Missouri and Florida) recognize that the payee under these circumstances has an election of remedies to proceed either in tort or in contract against the collecting bank. (*Henderson v. Lincoln Rochester Trust Co.*, supra; *Moch Co. v. Security Bank*, supra; *Lindsley et al., Aplnts., v. First Nat. Bank*, supra; *Zidek v. Forbes National Bank, Aplnt.*, 159 Pa. Super. 442, 48 A. 2d 103 [1946]; *Independent Oil Men's Ass'n v. Bank*, supra; *Buckley v. Second National Bank of Jersey City*, supra; *Passaic-Bergen Lumber Co., v. U. S. Trust Co.*, 110 N. J. L. 315, 164 Atl. 580 [1933]; *Carloading & Distributing Co. v. South Side Bank*, supra; and *Atlanta & St. A. B. Ry. Co. v. Barnes*, 96F. 2d 18 [5th Cir. 1938].)

The courts which recognize that the payee of a check under these circumstances has an election of remedies hold that if the payee elects to waive its remedy for the conversion, and prosecute the action to recover for the proceeds of the checks as for money had and received, it would be an irrevocable election whereby the payee would be confined to the remedy which it thus elected to prosecute. It is said this is what is meant by the opinions of the courts which state that by the election the tort is ratified.

In *Moch Co. v. Security Bank*, supra, the court said if the plaintiff payee ratified the conversion it would be out of court, for that would carry with it a ratification of all that was done, down at least to the time of the collection of the check, including the right of the wrongdoer to deposit the checks to the credit of his individual account, for it is to be inferred that such was the condition upon which he assumed to authorize the collecting bank to collect; and if the wrongdoer had that right there would be no basis for a recovery, for there is no evidence that the collecting bank had notice that the wrongdoer intended to appropriate the moneys to his

individual use other than was shown by the indorsement of the check and the deposit thereof to the credit of his individual account.

The court in *Moch* went on to say if the action be deemed one for money had and received, the plaintiff has abandoned any right to a remedy in conversion, as such; but it is not foreclosed from still complaining *for the purposes of this action* that the acts of the wrongdoer were without authority, and that no title either to the check or to the proceeds thereof passed to the collecting bank. By waiving the remedy in conversion the plaintiff does not, so far as the collecting bank is concerned, admit that it obtained good title to the check. It may still claim that the collecting bank did not have title, but that instead of seeking to recover for the value of the check it elects to recover *the proceeds* of the check in the hands of the collecting bank. In these situations the law implies a promise on the part of the collecting bank to account and pay the proceeds over to the payee who is the rightful owner.

Where the payee in cases of this type elects to recover from the collecting bank for money had and received, the payee's ratification of the collection by the intervening bank operates to cut off recourse against the drawer of the check on the original demand, and to supply the authority to collect which the intervening bank lacked. (*Atlanta & St. A. B. Ry. Co. v. Barnes,* supra.) The payee's act of ratifying the collection of the check for it also ratifies the assumed payment of the check, and both the drawer and the drawee of the check are released from paying it over again, because the payee, by ratifying the payment, is estopped from making a claim against either. (*Independent Oil Men's Ass'n v. Bank,* supra; and *Morgan v. Morgan,* 220 C. A. 2d 665, 678, 34 Cal. Rptr. 82 [1963].) This salutary approach avoids a multiplicity of suits.

Other cases in which the payee was permitted to recover from an intervening bank which collected the proceeds of a check over an unauthorized indorsement of the payee on the theory of contract are: *United States Co. v. U. S. Bank,* supra; *Strong v. Commonwealth Trust Co.,* 199 S. W. 1034 [Mo. 1917]; *Strong v. Missouri-Lincoln Trust Co. of St. Louis,* 263 S. W. 1038 [Mo. 1924]; *Morgan v. Morgan,* supra; *Buena Vista Oil Co. v. Park Bk. of L. A.,* 39 Cal. App. 710, 180 Pac. 12 [1919]; *George v. Security Trust & Savings Bank,* supra; and *Schapp v. First Nat. Bk. of Ft. Smith,* 137 Ark. 251, 208 S. W. 309 [1918].

The Kansas Supreme Court for many years has recognized that

when one person commits a wrong or tort against the estate of another, with the intention of benefiting his own estate, the law will, at the election of the injured party, imply or presume a contract on the part of the wrongdoer to pay the party injured the full value of all benefits resulting to the wrongdoer. The rule is based in part upon the premise that where property has been wrongfully detained from another, the law imposes a duty to return it and to pay the value of the use, which may be treated as the result of an implied contract. (*Ablah v. Eyman,* 188 Kan. 665, 365 P. 2d 181, 90 A. L. R. 2d 766, and authorities cited therein.)

In *Orozem v. McNeill,* 103 Kan. 429, 175 Pac. 633, rehearing denied 103 Kan. 694, 176 Pac. 106, it was recognized that in many cases the action of *assumpsit* is based primarily upon the fact that a tort was committed. In the opinion the court said:

". . . It is often said that the person aggrieved may waive the tort and sue upon the implied contract, but this expression is open to some misapprehension. What he waives is the right to seek relief through a procedure peculiar to actions founded on tort. Having the privilege of pursuing either remedy, he elects to declare upon an implied contract instead of upon the tort. He does not waive the wrong or fraud that has been practiced upon him by which the defendant has obtained his money or property, but he alleges in effect that because it was so unlawfully obtained from him a promise to restore it is implied.

" 'The tort is, however, waived only in the sense that a party having a right to sue in tort or assumpsit will not, after he has elected to sue in assumpsit, be allowed to sue in tort. By such an election that which was before the election tortious does not cease to be so. In fact, when the assumpsit is brought, it is only by showing that the defendant did a tortious act that the plaintiff is able to recover. There being no contract between the parties, unless the defendant is guilty of some wrong the plaintiff can establish no cause of action against him.' (Keener on Quasi-contracts, 159.)

"According to this view, the circumstance that the plaintiff is required to prove the fraud or other tort in order to recover does not prevent the maintenance of his action as one upon an implied contract." (pp. 431, 432.)

Another decision to the same effect is *Crabb v. Swindler, Administratrix,* 184 Kan. 501, 337 P. 2d 986.

There is one case in the Kansas reports, *Railroad Bldg., L. & S. Ass'n v. Bankers Mtg. Co.* 142 Kan. 564, 51 P. 2d 61, where a check, to which the name of the payee was indorsed without authority of the person whose signature it purported to be, was cashed for value by a bank which indorsed it and sent it forward for collection to the drawee bank where it was paid. It was held the drawer, upon dis-

covery of the fraudulént indorsement, could in an appropriate action recover from the intervening bank on the theory of contract.

The only difference between that and the instant case on the basic facts is that the drawer is suing the collecting bank instead of the drawee. In the opinion the court said:

". . . The theory upon which recovery has been allowed is upon the implied obligation to pay to the true owner the moneys received by the collecting bank and erroneously paid by it to the wrongdoer on the strength of the forged indorsement. Such an action whether denominated in assumpsit for money had and received or in trover, is upon the implied contract growing out of the circumstances. . . ." (p. 570.)

In arriving at such conclusion the court cited the annotation in 31 A. L. R. 1068. As a preface to this annotation two cases are reprinted in full: *Allen v. M. Mendelsohn & Son*, 207 Ala. 527, 93 So. 416, 31 A. L. R. 1063 (1922); and *Merchants' Bank v. National Capital Press*, 53 App. D. C. 59, 288 Fed. 265, 31 A. L. R. 1066 (1923), both of which held, on facts substantially identical to those in the case at bar, that the payee could recover for money had and received in an action of *assumpsit*—on the theory of contract.

This court is committed, where doubt exists as to whether an action is based on tort or implied contract, to the proposition that words appropriate to a tort action will be disregarded and the petition interpreted as sounding in contract. In *Ablah v. Eyman*, supra, the court said:

"A 'cause of action' is the wrong done, not the measure of compensation or character of the relief sought. (*Foster v. Humburg*, 180 Kan. 64, 67, 299 P. 2d 46.) When the pleader has stated the facts of his case, he will be entitled to recover thereon just what such facts authorize. (*Crabb v. Swindler, Administratrix*, 184 Kan. 501, 504, 337 P. 2d 986, and cases cited; *Vakas, Administratrix v. Collins*, 185 Kan. 103, 107, 340 P. 2d 99; *Wycoff v. Winona Feed & Grain Co.*, 187 Kan. 98, 103, 353 P. 2d 979.) Whether a cause of action is based on implied contract or tort is determined by the pleading (*Smith v. McCarthy*, 39 Kan. 308, 18 P. 204; *Dougherty v. Norlin*, 147 Kan. 565, 569, 78 P. 2d 65, and cases cited; *Crabb v. Swindler, Administratrix*, supra), but the petition need not state whether the action is based on implied contract or tort (*Akin v. Davis*, 11 Kan. 580, *Cockrell v. Henderson*, 81 Kan. 335, 337, 105 P. 443) and where doubt exists whether the action is based on tort or implied contract, words appropriate to a tort action will be disregarded and the petition will be interpreted as counting in contract. (*State Highway Comm. v. Puskarich*, 148 Kan. 385, 391, 83 P. 2d 131; *Crabb v. Swindler, Administratrix*, supra, p. 507; *Kipp v. Carlson*, 148 Kan. 657, 661, 84 P. 2d 899; *Dougherty v. Norlin*, supra.)" (p. 680.)

Upon our analysis of the cases from other jurisdictions, where an

intervening bank collects the proceeds of a check over a forged or unauthorized indorsement of the payee and misapplies the proceeds, we are persuaded by the reasoning of the courts which hold that the payee has an election of remedies—an election to prosecute the action in tort for the conversion of the check, or to waive its remedy for the conversion and prosecute the action to recover for the proceeds of the check as for money had and received on the theory of contract. While our court has not been called upon to decide the point presently under consideration upon the particular facts at hand, we think the Kansas cases, to which reference has heretofore been made, disclose this court is committed to the proposition, and therefore hold, that the payee of a check in the situation here presented has an option to sue the collecting bank in tort for the conversion of the check, or to waive the tort and sue the collecting bank upon the implied contract for money had and received.

Does the plaintiff's petition herein, and the evidence presented pursuant thereto, disclose an election on the part of the plaintiff to proceed on the theory of contract? For the reasons hereafter assigned we think it does.

The appellee argues that the appellant, having clearly and deliberately stated a cause of action in conversion, is bound by its theory and cannot now try to sue on some sort of contract theory. (Citing, *Green v. Kensinger,* 193 Kan. 33, 392 P. 2d 122.) It relies upon allegations in paragraphs numbered 4, 5 and 6·of the petition, respectively, as follows: "The defendant thereby misappropriated the proceeds and converted them to the personal use of Charles H. Mackey;" and, the defendant "deposited the check and placed its proceeds to the personal credit and account of Charles H. Mackey and converted the proceeds to the personal use of Charles H. Mackey;" and, "The conversion of the proceeds of the check was concealed from the plaintiff by Charles H. Mackey and the defendant."

It is to be noted these paragraphs *do not allege* that the defendant converted *the check* in question. All reference is to the *proceeds of the check,* which it is alleged were converted *to the use of Charles H. Mackey,* thereby indicating that the proceeds of the check collected from the drawee bank were not paid to the plaintiff, but misapplied to the use of Mackey.

Furthermore, there is no allegation in the petition that the defendant collected the check without authority. (*Moch Co. v. Se-*

*curity Bank,* 176 N. Y. App. Div. 842 [1917].) In paragraph No. 3 it is alleged the defendant accepted the check from Mackey and placed it to his personal credit; that in the due course of banking business the check was paid by the drawee and the defendant "collected the check and placed the $22,879.62 in proceeds thereof in the personal account and to the personal credit of Charles H. Mackey." These allegations suggest the plaintiff (payee) elected to ratify the collection of the check by the defendant (collecting bank).

Paragraphs numbered 3, 4, 5 and 6 of the petition all refer to *the proceeds* of the check in the defendant's hands. Paragraph No. 5 specifically alleges that "the check and the $22,879.62 in proceeds thereof were the property of the plaintiff." The foregoing paragraphs, together with paragraph No. 7 of the petition, tend to indicate the plaintiff is suing the defendant for the proceeds of the check.

Nothing in the record indicates that the plaintiff in the lower court tried the case as one in tort for the conversion of the check. The evidence tends to prove the allegations set forth in the petition.

We hold, upon the allegations of the petition and the evidence presented thereon, the appellant elected to waive the tort and sued the appellee *for the proceeds* of the check which the appellee collected from the drawee bank, and subsequently misapplied to the use of Charles Mackey. Accordingly, the three-year statute of limitations applies, and the trial court erred in entering judgment for the appellee on the ground that the two-year statute of limitations barred the action.

It necessarily follows the finding of the trial court—that the corporation, Mackey-Woodard, Inc., through its officers, either knew or could have reasonably ascertained no later than August 31, 1961, that the check which forms the basis of the instant action had been issued payable to Mackey-Woodard, Inc.; that the proceeds of such check were not deposited in any bank account of Mackey-Woodard, Inc.; and that the proceeds of such check were deposited in the account of Charles H. Mackey—is immaterial, because the action was filed within three years from the date of the transaction in question.

The appellee contends paragraph No. 6 of the petition, alleging concealment of the conversion which did not become ascertainable to the plaintiff until Mackey's death on February 14, 1963, shows

the appellant's effort to circumvent the two-year statute of limitations. One might just as easily speculate this allegation was made to forestall any doubt concerning the applicable statute of limitations, in the event the trial court should hold, as a matter of law, that the plaintiff had no election of remedies and was required to pursue a remedy in tort. As we construe the petition this allegation is surplusage.

While unnecessary to a decision in this case, the appellee calls our attention to an error made on a procedural point in *Pennsylvania National Mutual Cas. Co. v. Dennis*, 195 Kan. 594, 408 P. 2d 575. Recognizing the validity of the appellee's argument, we wish to correct the mistake at this first opportunity.

The court there correctly construed the defendant's motion for judgment on the evidence as the equivalent of a motion for involuntary dismissal embraced within the provisions of K. S. A. 60-241 (*b*). This section of the statute provides:

"For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him. After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. *In an action tried by the court without a jury the court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all of the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in section 60-252 (a).* Unless the court in its order for dismissal otherwise specifies, a dismissal under this subsection and any dismissal not provided for in this section, other than a dismissal for lack of jurisdiction or for improper venue, or for lack of indispensable party, operates as an adjudication upon the merits." (Emphasis added.)

In the *Dennis* case it was said:

"It is noted the provisions of 60-241 (*b*), *supra*, are identical to the provisions of Rule No. 41 (*b*) of the Federal Rules of Civil Procedure. (28 U. S. C. A., following section 2072.)" (p. 596.)

Rule No. 41 (*b*) of the Federal Rules of Civil Procedure has been amended by the United States Supreme Court twice, once in 1946, when the provisions above set forth in italics were added, and again in 1963, this second amendment being immaterial to our consideration of the rule, inasmuch as the rule was adopted by the Kansas legislature as it appeared after the 1946 amendment, but without incorporating the 1963 amendment. The Kansas legisla-

ture has added "or for lack of indispensable party," appearing in the last sentence which is not found in the Federal Rule.

In *Dennis* this court followed decisions of the United States Court of Appeals in the Third and Fourth Circuits, decided prior to the 1946 amendment, to the effect that in a nonjury case where a motion was made for involuntary dismissal under Rule No. 41 (*b*), such motion was equivalent to a motion for a directed verdict in a jury case; that the sole question was one of law whether the plaintiff's evidence and all the inferences fairly to be drawn from it in a most favorable light made out a *prima facie* case for relief.

The Sixth, Seventh and Ninth Circuits, on the other hand, held that the question was not whether there was sufficient proof to carry the case to the jury, but that the court itself being the trier of the facts had a right to apply its own judgment to the plaintiff's evidence, even though there was some conflict in the plaintiff's case, or even if there were two possible inferences to be drawn from the plaintiff's case. The court, as the trier of the facts, under these decisions, could apply its own judgment and grant or deny the judgment accordingly.

This inconsistency in the Federal Circuit courts led to the amendments of Rule No. 41 (*b*) in 1946 by the United States Supreme Court. As heretofore stated, the portion of 60-241 (*b*), *supra*, above set forth in italics, was added by the 1946 amendment to Federal Rule No. 41 (*b*) and adopted as a part of 60-241 (*b*) by the Kansas legislature with the new Code of Civil Procedure.

The Federal courts are in agreement as to the construction to be given Rule No. 41 (*b*) after the 1946 amendment. The Federal decisions after the 1946 amendment to Rule No. 41 (*b*) hold that in a nonjury case the trial judge has the power, on a motion for involuntary dismissal interposed by the defendant at the close of the plaintiff's evidence, to adjudicate the case on the merits at the conclusion of the plaintiff's evidence, in order to decide whether to grant judgment in the defendant's favor at that time. In other words, the judge, when sitting without a jury, may weigh and evaluate the evidence in the same manner as if he were making findings of fact at the conclusion of the entire case. The rule also provides, if the court renders judgment on the merits against the plaintiff, that these findings of fact shall be made "as provided in Rule 52 (*a*)." Upon review, the findings must be accepted unless clearly erroneous.

(*O'Brien v. Westinghouse Electric Corporation,* 293 F. 2d 1 [3rd

Cir. 1961]; *Huber v. American President Lines,* 240 F. 2d 778 [2nd Cir. 1957]; *Penn-Texas Corporation v. Morse,* 242 F. 2d 243 [7th Cir. 1957]; *United States v. General Dynamics Corporation,* 246 F. Supp. 156 [S. D. N. Y. 1965]; *Island Service Company v. Perez,* 309 F. 2d 799 [9th Cir. 1962]; *Ellis v. Carter,* 328 F. 2d 573 [9th Cir. 1964]; *Southern Arizona York Refrigeration Co. v. Bush Mfg. Co.,* 331 F. 2d 1 [9th Cir. 1964]; and *Palmentere v. Campbell,* 344 F. 2d 234 [8th Cir. 1965]. See, also, 3 Vernon's Kansas Statutes Annotated, Code of Civil Procedure, § 60-241, pp. 75, 76; and 2B Barron & Holtzoff, Federal Practice and Procedure, § 919, pp. 149-152.)

The United States Court of Appeals, Ninth Circuit, in *Ellis v. Carter,* supra, said:

"Ellis next argues that, when granting the motion to dismiss under Rule 41 (*b*), the trial court should have, but failed to, consider the evidence in a light most favorable to plaintiff. If this had been a trial by jury, the rule that plaintiff would have us apply here is admittedly the correct one. But it has been the position of this court—even before the 1946 amendment to Rule 41 (*b*)—that in a non-jury case, the trial judge has the power under Rule 41 (*b*) to adjudicate the case on the merits at the conclusion of the plaintiff's evidence, in order to decide whether to grant judgment in the defendant's favor at that time. Barr v. Equitable Life Assur. Soc., 9 Cir. 149 F. 2d 634; Young v. United States, 9 Cir., 111 F. 2d 823.

. . . . . . . . . . . . . .

"Accordingly, the trial court was not required to deny the 41 (*b*) motion even if the evidence, viewed in a light most favorable to the plaintiff, made a *prima facie* case. If, from the record as it stood at the close of plaintiff's case, the court was convinced that the evidence preponderated against Ellis, it was empowered to grant Carter's motion." (p. 577.)

Similarly, in *Palmentere v. Campbell,* supra, the court said:

"Plaintiff contends that upon review of the judgment here attacked, he is entitled to have the evidence viewed in the light most favorable to him and that he is entitled to have the benefit of inferences that may reasonably be drawn from the evidence. Such is the recognized rule on review of directed verdicts in cases tried to a jury. Cases cited by plaintiff to support his position are cases which were tried to a jury. Here the case was tried to the court without a jury and the court was the finder of facts. In cases tried to the court without a jury, the rule is:

" '[O]n a motion made under Rule 41 (*b*), the judge, when sitting without a jury, must weigh and evalute the evidence in the same manner as if he were making findings of fact at the conclusion of the entire case. The Rule also provides that these findings of fact shall be made "as provided in Rule 52 (*a*)", and the defendant validly reasons that since Rule 52 (*a*) states that findings of fact shall not be set aside unless clearly erroneous, that test must apply in our review of the district court's findings in this case.' Benton v. Blair, 5 Cir., 228 F. 2d 55, 58." (pp. 237, 238.)

The 1946 amendment to Federal Rule 41 (*b*) permitting the judge to weigh the evidence under the circumstances above indicated, has been sharply attacked by a noted scholar as "A misbegotten offspring of an unseemly desire for speed and hurry" which "has no place in our system of justice." (See, Steffen, *The Prima Facie Case in Non-Jury Trials,* 1959, 27 U. Chi. L. Rev. 94, 125.) This court, however, strives for uniformity in procedure, particularly where the Federal Rules have been construed and adopted without change in our code of civil procedure. Accordingly, the construction placed upon K. S. A. 60-241 (*b*), where the defendant in an action tried to the court without a jury moves for involuntary dismissal of the action at the close of the plaintiff's case, in *Pennsylvania National Mutual Cas. Co. v. Dennis* supra, is erroneous and the decision on this point is overruled. The construction given Federal Rule No. 41 (*b*) by the Federal courts, under the circumstances above indicated, is hereby adopted and approved as the construction to be placed upon K. S. A. 60-241 (*b*).

The judgment of the lower court is reversed with directions to proceed with the trial of the action.