No. 47,052

UNION NATIONAL BANK AND TRUST Co., Manhattan, Kansas, *Appellant*, v. STEVENS B. ACKER and GLENNA ANN ACKER, *Appellees*.

(516 P. 2d 999)

492

Opinion filed December 8, 1973.

*Howard Harper,* of Harper, Hornbaker & Abbott, of Junction City, argued the cause, and *C. Robert Bell,* of Morris, Laing, Evans & Brock, Chartered, of Wichita, was with him on the brief for the appellant.

*William F. Kluge, III,* of Lambdin & Kluge, Chartered, of Wichita, argued the cause and was on the brief for Glenna Ann Acker, appellee.

The opinion of the court was delivered by

KAUL, J.: The appellant, Union National Bank of Manhattan, hereafter referred to as the Bank, brought this action to impress an equitable mortgage upon a house in Wichita.

In December of 1966, Stevens and Glenna Acker, husband and wife, resided in Wichita. They desired to build a new home and initiated construction with $6,000.00 of their own money. In January 1967, Stevens, through his father William Acker, who resided in Manhattan, arranged to borrow funds from the Bank to finance the construction. During the next few months Bank advanced, in several payments, a total of $46,000.00. Concurrent with each advance by Bank, Stevens, Glenna and William Acker signed a note as comakers. In September 1967 the earlier notes came due and were replaced by a single note representing the total indebtedness of $46,000.00. Stevens, Glenna and William again signed the note as comakers. In the interim between September 1967 and the filing of this lawsuit on January 26, 1972, the note was renewed ten or eleven times. Each time it was signed by the three Ackers as comakers. In July 1971 the marriage of Stevens and Glenna ran into difficulties and a divorce action was filed. Thereafter, Bank initiated this litigation.

In its petition, as amended, Bank alleged that defendants, Stevens and Glenna, because of high interest rates on real estate mortgages prevailing at the time, desired to obtain a loan on a temporary basis with the understanding that it was to be replaced sometime in the near future with a permanent long-term mortgage either with Bank or with another mortgagee. Bank further alleged that Stevens and Glenna were in the process of getting a divorce and that it was informed that one of the defendants, if not both, denied the existence of its equitable mortgage upon the property. Bank prayed for a judgment declaring it to have an equitable mortgage upon the property to secure the indebtedness.

Glenna answered Bank's petition alleging she had never made any representation to Bank or its agents; that she had never authorized Stevens to enter into any transactions on her behalf; that Bank had indicated to her husband that Wichita was outside its banking area and, therefore, was unable to take a mortgage on the property; and that Bank was relying upon the signature of William rather than upon its alleged mortgage. Glenna further alleged the property was her homestead.

On February 24, 1972, Glenna also filed a separate cross-petition against Stevens. Apparently, Glenna and Stevens had been divorced prior to the filing of Glenna's cross-petition. Glenna alleged that at no time did she ever authorize Stevens to enter into any agreements with Bank; that Stevens on September 29, 1971, (apparently on discovery deposition in the divorce action) stated upon his oath that there was no mortgage on the house; and that during the divorce trial on January 24, 1972, Stevens reiterated that there was no mortgage. Glenna further alleged that the house in question was awarded to her in the division of property in the divorce action; and that if Bank's equitable mortgage were to be impressed upon the property the division of property previously decreed in the divorce action would be rendered meaningless and Stevens would be unjustly enriched in an amount equal to the value of the property.

Stevens answered Glenna's cross-petition generally denying the allegations thereof and affirmatively alleging that he and Glenna had entered into an agreement as alleged by Bank; and that Glenna knew the intent and purpose of the agreement.

With the issues thus joined this case came on for trial on May 5, 1972. After Bank had submitted all of its evidence, Glenna moved for dismissal. The trial court sustained Glenna's motion and this appeal followed. In announcing its decision the trial court quoted an excerpt from the opinion in *Hill v. Hill*, 185 Kan. 389, 345 P. 2d 1015, and made findings shown in the record as follows:

"Reading from the body of the opinion which you have just quoted, Mr. Bell, for the Court, it states:

" 'Where one party advances money to another upon the faith of an agreement by the latter to secure its payment by a mortgage upon certain lands, . . .' and in this case, the Court cannot find that there was any agreement to that effect; in fact, it is just to the contrary. The evidence discloses that they were perfectly content to look to the signature of Dr. Acker's father for their security rather than to the property in question. There was some dis-

cussion between the parties regarding execution of a mortgage, if, and based upon, the contingency that it could not be procured at lower rates at a later date in the Wichita area; but the testimony even then discloses that the Bank was in fact reluctant to accept a mortgage on property that was more than fifty miles outside of the area.

"I think the key word in the Hill case is that of intent. Reading from the Syllabus that, 'If the intent appears to give or charge real property as a security for an obligation, the lien follows.' And considering the plaintiff's evidence in its best light, I don't think there was ever that intent to look to the property for the security. I think they were looking entirely to Dr. Acker.

"I am going to sustain the motion to dismiss."

At oral argument it was agreed by counsel that where the trial court referred to "Dr. Acker" in the last sentence of its ruling, the court intended and meant to say "William" rather than Doctor Acker—Stevens Acker being the doctor.

We view the instant litigation as essentially a fact case. Our rule on appeal is simply to ascertain whether there is any substantial competent evidence to sustain the trial court's findings and judgment.

Where, as in the present case, the defendant in an action tried to the court without a jury moves for involuntary dismissal of the action at the close of the plaintiff's case, pursuant to the provisions of K. S. A. 1972 Supp. 60-241 (b), based on the ground that upon the facts and the law the plaintiff has shown no right to relief; that trial judge has the power to weigh and evaluate the evidence in the same manner as if he were adjudicating the case on the merits and making findings of fact at the conclusion of the entire case. The trial court's findings of fact will be upheld if there is substantial evidence to support them, and the evidence will be viewed in the aspect most favorable to the party prevailing below. (*Armstrong v. City of Salina,* 211 Kan. 333, 507 P. 2d 323; *In re Estate of Ewers,* 206 Kan. 623, 481 P. 2d 970; *Wiley v. Board of Education,* 205 Kan. 585, 470 P. 2d 792; *Waterstradt v. Board of Commissioners,* 203 Kan. 317, 454 P. 2d 445; and *Mackey-Woodard, Inc. v. Citizens State Bank,* 197 Kan. 536, 419 P. 2d 847.)

The gist of Bank's case was that defendants had agreed and intended to give or charge the property in question as security for the indebtedness. As to agreement and intention the trial court found Bank's evidence insufficient. A trial court's failure to find the existence of a fact or if it finds the nonexistence of a fact or set of facts has been characterized by this court as a negative

finding. The effect of a negative finding is that the party upon whom the burden of proof was cast did not sustain his burden. Absent the arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias or prejudice on the part of the jury or trial court an appellate court cannot nullify a trial judge's disbelief of evidence nor can it determine the persuasiveness of evidence which the trial court may have believed. (*Short v. Sunflower Plastic Pipe, Inc.,* 210 Kan. 68, 500 P. 2d 39; *American Housing & Investment Co. v. Stanley Furniture Co.,* 202 Kan. 344, 449 P. 2d 561.)

The parties do not dispute the applicable law governing the establishment of an equitable mortgage. Equitable mortgages have long been recognized and the incidents thereof clearly defined in many decisions of this court dealing with the subject. (*Bank v. Pickering,* 111 Kan. 132, 205 Pac. 1110; *Foster v. Bank,* 71 Kan. 158, 80 Pac. 49; and *Charpie v. Stout,* 88 Kan. 318, 128 Pac. 396.) A more recent case which we believe particularly apposite to Bank's theory in the instant case is *Hill v. Hill,* supra, wherein we held:

"Where one party advances money to another upon the faith of an agreement by the latter to secure its payment by a mortgage upon certain lands, but which is never executed, or which, if executed, is so defective or informal as to fail in effectuating the purpose of its execution, equity will impress upon the land intended to be mortgaged a lien in favor of the creditor who advanced the money for the security and satisfaction of his debt.

"The form of an agreement by which security is given for a debt is unimportant. If the purpose plainly appears equity regards the substance and gives effect to the intention. Courts of equity are not governed by the same rules as courts of law in determining whether a mortgage has been created. If the intent appears to give or charge real property as a security for an obligation the lien follows." (Syl. ¶¶ 3, 4.)

Decisions of this court are in line with the general rule appearing in 55 Am. Jur., 2d, Mortgages, § 12, pp. 201-202:

"Under the maxim 'equity regards that as done which ought to be done,' an agreement to secure an obligation by a mortgage is generally regarded as operating as an equitable mortgage. This is true where real estate is acquired with money loaned for the purchase, under a promise that the lender is to receive a mortgage. . . ."

In each of the Kansas cases cited by Bank the trial court had affirmatively found there was an agreement between the parties which supported the imposition of an equitable mortgage. In the instant case the court specifically found there was no agreement to give a mortgage and that there was no intent to give or charge the

property as security on the part of defendants, or intent to look to the property for security on the part of Bank.

Thomas Griffith, chairman of the board of directors of the bank and a long-time friend and neighbor of William Acker, testified by deposition. Mr. Griffith testified that on many occasions the note had been examined by bank examiners and never questioned; that there was no problem as long as the note bore the signature of William Acker who had a financial statement on file with Bank reflecting a substantial net worth. Mr. Griffith further testified that Bank had always carried the note as an "open note" or unsecured obligation and further that he would not have made the loan without William's signature.

William Acker testified that he arranged for Stevens and Glenda to borrow the money from Bank; that he had discussed the possibility of giving a mortgage with Stevens and Glenna; and that he knew there was a mortgage clause in the insurance policy which had been issued on the property.

Glenna testified that Stevens told her that he and his father had made arrangements with Bank to borrow the money for the construction of their home. When questioned concerning her knowledge of the arrangements she testified:

"A. Stevens said that he and his dad had made arrangements.
"Q. When did he tell you that?
"A. Uh, early in 1967 during the building period of the house.
"Q. Was it before the house was completed?
"A. Yes.
"Q. And did he tell you what those arrangements were?
"A. That it was an open note.
"Q. He didn't ever mention that there was an agreement to secure a mortgage on it at a later date?
"A. I asked him why he didn't get a regular mortgage and he said to me that the bank would not give a mortgage on a property that was more than fifty miles from the bank, so that he could not get a regular mortgage.
"Q. This was Stevens B. Acker, the other defendant?
"A. Yes."

Stevens testified that his father had made the arrangements with Bank; that his father told him that Mr. Griffith did not desire to issue a mortgage more than fifty miles outside Manhattan. Stevens further testified that on all of the occasions on which he had renewed the note he was never asked to give a mortgage. Stevens admitted that he had testified in the divorce trial that the property was free and clear of any mortgage.

Under the applicable rules governing our review, to which we have referred; in order to reverse the judgment we would have to say that the undisputed evidence herein shows an agreement to mortgage the property and that an intent clearly appears to charge it as security for the obligation. This we cannot do. There is testimony of both Glenna and Stevens which negates agreement and intention. The most that could be inferred from Mr. Griffith's testimony was that there was a conditional understanding that Stevens and Glenna were to secure a mortgage in Wichita and pay off the loan to Bank, but that if they were unable to do so, Bank would take a mortgage on the property.

The judgment is affirmed.