[L.A. No. 30087. In Bank. Mar. 20, 1973.]

ABRAHAM COOPER et al., Plaintiffs and Appellants, v.
UNION BANK et al., Defendants and Respondents.

374

COUNSEL

Stell & Levine and Arthur S. Levine for Plaintiffs and Appellants.

Ernest S. Gould, Robert F. Strange, Cosgrove, Cramer, Rindge & Barnum and L. P. McElhaney for Defendants and Respondents.

OPINION

MOSK, J.—We here consider the rights of the true owner of a negotiable instrument which has been collected and paid on a forged indorsement. The question has not previously arisen in this state under the Uniform Commercial Code, and has seldom been addressed in other jurisdictions.[1]

[1]The only case directly on point with respect to the liability of a collecting bank to the true owner appears to be *Ervin* v. *Dauphin Deposit Trust Co.* (Pa. Ct. of Com. Pls. 1965) 38 Pa.D.&C.2d 473 [3 U.C.C. Rep. 311]. This case has received considerable attention from commentators; see, e.g., Advanced ALI-ABA Course of Study on Banking and Secured Transactions under the Uniform Commercial Code (ALI 1968) pages 54-57 (dialogue between Prof. E. Allan Farnsworth and Fairfax Leary, Jr.); Bailey, The Law of Bank Checks (4th ed. 1969) section 15.14, pages 496-501; Clark & Squillante, The Law of Bank Deposits, Collections and Credit Cards (1970) pages 141-147. The *Ervin* case appears to reach the same conclusion expressed herein. In *Harry H. White Lbr. Co.* v. *Crocker-Citizens Nat. Bk.* (1967) 253 Cal.App.2d 368, 376 [61 Cal.Rptr. 381], the court held that the true owner of an instrument has a cause of action against the collecting bank under the code, but did not deal with the bank's possible defenses. The court stated, however, that the code appeared not to change pre-existing California law with respect to the liability of collecting banks. See also *Salsman* v. *National Community Bank of Rutherford* (1968) 102 N.J.Super. 482 [246 A.2d 162], which held a collecting bank liable on the ground it had violated reasonable commercial standards. *Federal Dep. Ins. Corp.* v. *Marine Nat. Bank of Jacksonville* (5th Cir. 1970) 431 F.2d 341 and *Belmar Trucking Corp.* v. *American Trust Co.* (N.Y.Civ.Ct. 1970) 8 U.C.C. Rep. 73, were decided on the same basis.

The record recounts a typical tale of forgery. Plaintiff Joseph Stell, an attorney, employed one Bernice Ruff as a secretary and bookkeeper. During a period of approximately a year and one-half Ruff purloined some 29 checks intended for Stell and forged the necessary indorsements thereon.[2] She cashed some of these checks at defendants Union Bank and Crocker Citizens National Bank and deposited the remainder (except one that was cashed elsewhere) to her personal account at the latter bank. The entire amount of such deposits was subsequently withdrawn by Ruff prior to discovery of the forgeries. Certain of the checks were forwarded to and paid by defendants Crocker Citizens National Bank, Security First National Bank, and First Western Bank and Trust Company; the remainder were drawn on payors who are not parties to this action.

Stell and his partners bring this action in conversion against both the collecting and the payor banks to recover the amounts of the instruments handled by them on the forged indorsements. The critical California Commercial Code provision[3] is section 3419 which establishes that "(1) An instrument is converted when . . . (c) It is paid on a forged indorsement." Notwithstanding this language, the superior court denied recovery on the basis of section 3419, subdivision (3), which provides: "(3) Subject to the provisions of this code concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands."

The court concluded that all defendants in the case, including payor

---

Except for the *Ervin* case, these decisions do not discuss the issue of whether the collecting bank retains the proceeds of the instrument. See also *Stone & Webster Eng. Corp.* v. *First National B. & T. Co.* (1962) 345 Mass. 1 [184 N.E.2d 358, 99 A.L.R.2d 628] (action by drawer against collecting bank denied). There appear to be no cases discussing in detail the right of the true owner to recover from the payor bank under the Uniform Commercial Code; in the *Ervin* case, however, such an action was upheld on demurrer. (See Annot: Construction and Effect of U.C.C. Art. 3, Dealing With Commercial Paper, 23 A.L.R.3d 932, 1002-1004.)

[2]Twenty-one of the checks were made out to Stell. Of these, one was intended for Stell personally, fourteen were intended for a joint venture of which Stell and the other plaintiffs were members, and six were intended for a receivership of which Stell was receiver. The remaining eight instruments were made out in the name of and intended for one Rebecca Smithson, one of Stell's clients. Stell has been assigned the rights of the receivership and of Rebecca Smithson.

[3]All code references are to the California Commercial Code unless otherwise indicated.

as well as collecting banks, qualified as representatives, had acted in good faith and in accordance with reasonable commercial standards, and had no proceeds remaining in their hands. Thus defendants were held immune from liability. The court also found that plaintiffs had been negligent in failing to discover Ruff's defalcations by April 1, 1966, approximately six months following their commencement, and that such negligence substantially contributed to the making of the subsequent forged indorsements. On this additional basis it held plaintiffs were "precluded from asserting such forgeries or lack of authorized signatures against any of the respective Defendants herein on checks presented after April 1, 1966."

We hold that the trial court relied on an erroneous interpretation of section 3419 and that therefore the judgment must be reversed in part. Inasmuch as collecting banks and payor banks raise distinctive issues under section 3419, the application of this section to the two categories of banks will be discussed separately.

### Collecting Banks

It is clear, excluding for the moment the issue of plaintiffs' negligence, that defendant collecting banks are liable for conversion unless they can establish a defense under section 3419, subdivision (3). A careful study of this provision, however, reveals no possible defense in this case after it becomes evident that the court below erroneously held defendant collecting banks had parted with the proceeds of the fraudulently indorsed instruments. The code, unfortunately, fails to define the word "proceeds" in the context of bank collection. Therefore, to fully comprehend the code section we must examine the concept of proceeds as it was understood prior to enactment of the code and to general theory of bank collection found elsewhere in the code and in other parts of the law.[4]

Whether defendant depositary banks have any proceeds of the fraudulently indorsed checks remaining in their hands is resolved through a bifurcated inquiry: first, did they receive any proceeds and second, have they parted with any proceeds they may have received? Each of these queries is more complex than superficially appears. A collecting bank obviously does not receive any proceeds of an instrument unless such proceeds are forwarded to it from a payor bank. ■ Under the dominant theory of bank collection that preexisted the code and which the code has left unchanged, however, the amounts a payor bank remits on

---

[4]For an extensive discussion of the history of legal treatment of forged indorsements and the environment from which the Uniform Commercial Code provisions grew, see Kessler, *Forged Indorsements* (1938) 47 Yale L.J. 863.

a forged indorsement are not considered the proceeds of the instrument. The explanation for this result lies in the relationship between a payor bank and its customer, the depositor-drawer. The relationship is one of debtor and creditor: the bank is indebted to the customer and promises to debit his account only at his direction. If the bank pays, on an instrument drawn by its customer, any person other than the designated payee or a person to whom the instrument is negotiated, the bank's indebtedness to the customer is not diminished. If the bank does debit the customer's account, the customer can compel the bank to recredit the sum. Inasmuch as the full amount of the instrument remains in the account of the drawer when the bank pays on a forged indorsement, the bank manifestly does not part with the proceeds of the instrument but merely remits other funds from its own account.[5]

 General bank collection theory also instructs us that the true owner, in bringing an action against a collecting bank for conversion of a check collected on a forged indorsement, is deemed to have ratified the collection of the proceeds from the payor bank. This ratification transmutes the remittance of funds by the payor bank into an authorized act for which it may debit its customer's account.[6] In the case at bar, it appears that plaintiffs' action against defendant collecting banks constitutes such a rati-

---

[5]"The general rule must be conceded that the undertaking of a bank is to pay out the depositor's money only on the order of the depositor and in accordance with that order. If it pays out money on a check drawn to order, . . . upon a forged indorsement of the payee's name, it has not paid in accordance with the depositor's order, and in the absence of anything further, has no right to charge such payment against the depositor's account." (*Los Angeles Inv. Co.* v. *Home Sav. Bank* (1919) 180 Cal. 601, 604 [182 P. 293, 5 A.L.R. 1193]; see Britton, Bills and Notes (2d ed. 1961) § 142, pp. 406-407, § 147, p. 422; 10 Am.Jur.2d, Banks, §§ 622, 623, pp. 586-589; Johnson & Parachini, *Forged Indorsements and Conflict of Laws* (1965) 82 Banking L.J. 95; see also cases cited in Beutel, Brannan's Negotiable Instruments Law (7th ed. 1948) § 23, pp. 445-447.) It appears that nothing in the Uniform Commercial Code changes this relationship between a bank and its depositor. It is consequently preserved by section 1103, which provides: "Unless displaced by the particular provisions of this code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions."

[6]Although courts have employed various theories in holding collecting banks liable, the theory of ratification appears to have dominated. (See *Mackey-Woodard, Inc.* v. *Citizens State Bank* (1966) 197 Kan. 536 [419 P.2d 847, 853-854]; *United States Port. Cement Co.* v. *United States Nat. Bank* (1916) 61 Colo. 334 [157 P. 202]; *Independent Oil Men's Ass'n* v. *Fort Dearborn Nat. Bank* (1924) 311 Ill. 278 [142 N.E. 458, 459]; Britton, Bills and Notes (1961) *supra,* § 147, pp. 422-424.) The ratification doctrine has been firmly established in the law of California; see *Morgan* v. *Morgan* (1963) 220 Cal.App.2d 665, 678 [34 Cal.Rptr. 82]; *Jones* v. *Bank of America* (1942) 49 Cal.App.2d 115, 121-122 [121 P.2d 94]; *George* v. *Security Trust and Savings Bank* (1928) 91 Cal.App. 708 [267 P. 560].

fication, and these banks, therefore, must be considered to have received the proceeds of the instruments.

Ratification of collection, however, does not constitute a ratification of the collecting banks' delivery of the proceeds to the wrong person. The dominant pre-code law established, on the contrary, that the proceeds were held, after collection by the collecting bank, for the benefit of the true owner.[7] ■ Again resorting to general banking theory, we find that the amounts a collecting bank remits to a person who transfers to the bank a check bearing a forged indorsement do not constitute the proceeds of the instrument. This result is quite clear in the case of an instrument cashed over the counter. At the time the bank takes such an instrument it has obviously not made any prior collection and, thus, has nothing that could be considered proceeds. The money paid over the counter is, consequently, the bank's own money. Upon collection of the instrument, the proceeds become merged with the bank's general funds and are therefore retained by the bank. (See Advanced ALI-ABA Course of Study on Banking and Secured Transactions under the Uniform Commercial Code (ALI 1968) *supra,* p. 56.)

A bank that accepts an instrument for deposit likewise ultimately retains the proceeds of that instrument. Such a bank is initially considered to be an agent of the person who delivers the instrument to it for collection. When, however, the bank receives a final settlement for an item it has forwarded for collection, the agency status typically ends, and the bank becomes a mere debtor of its customer. As a mere debtor, it becomes entitled to use the proceeds as its own.[8]

The foregoing view was expressed by Justice Cardozo for the United States Supreme Court in the following terms: "Whether a fiduciary relation continues even afterwards [when the collecting bank has completed the business of collection] upon the theory that the proceeds of the collection until remitted to the forwarder are subject to a trust, depends upon the circumstances. In the absence of tokens of a contrary intention, the better doctrine is, where the common law prevails, that the agency of the collecting bank is brought to an end by the collection of the paper, the bank from then on being in the position of a debtor, with the liberty, like debtors generally, to use the proceeds as its own." (*Jennings* v. *U.S.F. & G. Co.* (1935) 294 U.S. 216, 219 [79 L.Ed. 869, 872, 55 S.Ct. 394, 99 A.L.R. 1248].)[9]

---

[7] See authorities cited in footnote 6, *supra.*

[8] See 5 Scott on Trusts (3d ed. 1967) section 534, pages 3712-3718.

[9] We disagree, however, with any implication that might be read into *Jennings* that the collecting bank does not receive the proceeds of the instrument for the purpose

It is significant that the Commercial Code does not make a collecting bank accountable to its customer for the *proceeds* of an instrument but only for "the *amount* of the item." (§ 4213, subd. (3); italics added.) Justice Cardozo's conception of the post-collection status of collecting banks is clearly preserved: "[I]f a collecting bank receives a settlement for an item which is or becomes final, the bank is accountable to its customer for the amount of the item. One means of accounting is to remit to its customer the amount it has received on the item. If previously it gave to its customer a provisional credit for the item in an account its receipt of final settlement for the item 'firms up' this provisional credit and makes it final. When this credit given by it so becomes final, in the usual case *its agency status terminates and it becomes a debtor to its customer for the amount of the item.*" (§ 4213, com. 9; italics added.)

As suggested by Justice Cardozo, the parties can by mutual agreement extend the agency relationship until the amount of an instrument is received by the customer. Under such an agreement the proceeds would be maintained as a separate fund until paid over to the customer.[10] The ordinary banking transaction, however, contains no such agreement, and it is apparent that there was none in the present case. Defendant collecting banks, on the contrary, became debtors, and the proceeds of the instruments were completely merged with the banks' own funds. The effect of this commingling is that the banks retain the proceeds of the instruments even though amounts set forth in the instruments, in the banks' own money, were remitted to Ruff. This conclusion is derived by reference to the law of constructive trusts. The cases in that area establish that money received by a bank and mingled with the bank's funds is traceable by a proper claimant into those funds. This result is unaffected by withdrawals so long as the amount of the cash on hand is not diminished below the amount of the claimant's money that has been mingled with the fund.[11] Since it is obvious that no such severe diminution of funds occurred in the present case, de-

---

of section 3419 when the instrument is collected through a clearing house and the proceeds are used to offset liabilities of the collecting bank.

[10]Restatement Second of Agency, section 398; Seavey, The Law of Agency (1964) section 153, page 250.

[11]Scott on Trusts, *supra*, section 540, page 3734, states: "Where the bank has mingled cash of the claimant with its own cash, it is perfectly well settled that the right of the claimant to follow his money is not lost. The mere fact that the cash of the claimant is indistinguishably mingled with the cash of the bank does not cut off the claimant's interest, but he acquires an equitable lien upon the whole of the mingled cash in the bank. This is in accordance with the general rule as to the effect of mingling funds. It is immaterial that withdrawals have been made from the cash and additions of the bank's own money have been made, so long as the amount of cash on hand is not diminished below the amount of the claimant's money which has been mingled in the fund."

fendant collecting banks must be deemed to retain the proceeds of the instruments transferred by Ruff, regardless of whether those instruments were cashed or accepted for deposit.[12]

Our conclusion that defendant collecting banks did not part with the proceeds of the instruments in making the various payments to Ruff is reinforced by several additional factors. To begin with, had the draftsmen of the Commercial Code intended to absolve collecting banks from liability by virtue of such payments, it seems probable they would have employed language more explicit than that of retaining or parting with proceeds. Instead, the words "for value" could have been employed. The collecting banks in this case are in a situation comparable to that of a holder in due course under the Commercial Code or a bona fide purchaser under the law of constructive trusts inasmuch as they took property and in return gave consideration to the transferor. With respect to a holder in due course or a bona fide purchaser, however, this consideration is termed "value." (§ 3302; 5 Scott on Trusts, *supra*, §§ 474-475, pp. 3454-3456.) The fact that different terminology is contained in section 3419, subdivision (3), suggests that the ambiguous language of this provision was not intended to refer to the giving of such consideration. If the draftsmen and the Legislature had intended to protect collecting banks that had merely given value for an instrument, it may be assumed they would have clearly said so.

Secondly, an examination of the law existing prior to the enactment of the Uniform Commercial Code reveals a nearly unanimous agreement among the jurisdictions that the true owner of an instrument collected on a forged indorsement could recover in a direct suit against a collecting bank even though the bank had acted in good faith and with the highest degree of care and even though it had remitted the amount of the instru-

---

[12]*Ervin* v. *Dauphin Deposit Trust Co.* (1965) *supra*, 38 Pa.D.&C.2d 473 [3 U.C.C. Rep. 311, 319], arrives at this same conclusion. The court states: "When [the collecting bank] purchased or cashed the forged checks drawn on other banks it did so with its own money and then, in putting them through for collection it obtained from the drawee banks money which belongs to the plaintiff." Commentators have suggested that the *Ervin* case may stand for the rule that the collecting bank parts with the proceeds if it accepts an instrument for deposit in an account and later pays out the money in the account but does not part with the proceeds if it cashes the instrument. (Advanced ALI-ABA Course of Study on Banking and Secured Transactions under The Uniform Commercial Code (ALI 1968) *supra*, pp. 54-57 (dialogue between Professor E. Allan Farnsworth and Fairfax Leary, Jr.); Clark & Squillante, The Law of Bank Deposits, Collections and Credit Cards (1970) pp. 143-144.) There appears to be no practical rationale for this arbitrary solution, and the *Ervin* decision clearly appears to negate it: "As far as the problem in the instant case is concerned we can find no distinction between the *cashing* of a forged check and the *accepting* of such check for deposit. . . ." (3 U.C.C. Rep. at p. 315.)

ment to a prior party.[13] Since the rule had apparently operated satisfactorily, there is no reason to believe the code draftsmen or the Legislature would have wished to modify it to make direct suits extremely difficult.

■ As discussed below, the payor bank is in effect strictly liable to the true owner if it pays an instrument on a forged indorsement. The collecting banks that handled the instrument for collection are, in turn, strictly liable to the payor bank for breach of warranty of good title. (§ 4207.)[14] Because liability ultimately rests with the first collecting bank, it is unlikely that such a bank was intended to have a ready defense in a direct suit by the true owner. Requiring cumbersome and uneconomical circuity of action

---

[13]"The vast majority of cases in this country hold, in the absence of negligence, laches or estoppel, that a collecting bank which cashes a check on a forged or unauthorized indorsement of the payee, and procures the proceeds thereof from the drawee, is liable to the payee who is the true owner of the check." (*Mackey-Woodard, Inc.* v. *Citizens State Bank* (1966) *supra,* 419 P.2d 847, 852.) See, e.g., *Morgan* v. *Morgan* (1963) *supra,* 220 Cal.App.2d 665, 677; *Jones* v. *Bank of America* (1942) *supra,* 49 Cal.App.2d 115, 122; *George* v. *Security Trust and Savings Bank* (1928) *supra,* 91 Cal.App. 708; *Henderson* v. *Lincoln Rochester Trust Co.* (1951) 303 N.Y. 27 [100 N.E.2d 117, 119-120]; *Independent Oil Men's Ass'n* v. *Fort Dearborn Nat. Bank* (1924) *supra,* 311 Ill. 278 [142 N.E. 458, 459]; *Gresham State Bank* v. *O and K Construction Co.* (1962) 231 Ore. 106 [370 P.2d 726, 729, 100 A.L.R.2d 654]; *United States Port. Cement Co.* v. *United States Nat. Bank* (1916) *supra,* 61 Colo. 334 [157 P. 202]. See Annotation: Right of check owner to recover against one cashing it on forged or unauthorized indorsement and procuring payment by drawee, 100 A.L.R.2d 670; 10 Am.Jur.2d, Banks, section 632, pages 599-600. The leading case reaching a result that opposed the general rule (*Tibby Bros. Glass Co.* v. *Farmers' and Mechanics' Bank* (1908) 220 Pa. 1 [69 A. 280]) was expressly overruled in a subsequent decision (*Lindsley* v. *First Nat. Bank of Philadelphia* (1937) 325 Pa. 393 [190 A. 876]).

[14]"§ 4207. [Warranties of Customer and Collecting Bank on Transfer or Presentment of Items; Time for Claims] (1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that (a) He has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has good title. . . ." (§ 3417 provides for a parallel remedy against nonbank transferors of instruments.) The remedies of direct action by the true owner and of circuitous action through the payor bank are not strictly coincident inasmuch as the payor's warranty action may be barred by his failure to act in a timely fashion. Section 4207, subdivision (4), provides: "Unless a claim for breach of warranty under this section is made within a reasonable time after the person claiming learns of the breach, the person liable is discharged to the extent of any loss caused by the delay in making claim." This proviso is of small significance with respect to forged indorsements since the forgery is rarely, if ever, discovered soon enough to prevent loss. The fact that the direct action and the circuitous action might result in different allocation of liability in one improbable situation appears insufficient to justify the diseconomy and injustice created by circuitous action. Moreover, assuming the payor bank failed to make a timely claim to the collecting bank, which failure proximately resulted in the collecting bank's payment of the amount of an instrument on a forged indorsement, and that the true owner recovered from the collecting bank in a direct action, it would appear that the collecting bank should be able to recover its loss from the payor bank, if not under the code, in an action for common law negligence or in a suit in equity to prevent unjust impoverishment.

to achieve an identical result would obviously run contra the code's explicit underlying purposes "to simplify, clarify and modernize the law governing commercial transactions." (§ 1102, subd. (2) (a).)

Such a modification would also create a significant potential for injustice. In cases involving forged indorsements collecting banks are generally the most feasible defendants. A forger typically transfers instruments bearing forged indorsements to only one or two banks for collection. Often the banks are located near the true owner. Thus it would be practical for him to bring a suit against such banks. The payors, by contrast, may be situated in many and distant states or in foreign countries, and the drawers may be equally geographically diverse. Even though the collecting banks would be ultimately liable after initial suits were brought in all the various fora, the expense and difficulty of bringing such suits would have the actual effect of freeing the collecting banks from any responsibility. The true owner would be required to shoulder the loss that should have been that of the banks; thus the banks would receive a windfall. That section 3419, subdivision (3), was intended to produce this unjust result is highly doubtful.

Had such substantial and controversial deviation from prior law been intended, moreover, it could be expected that the official commentary to section 3419 would have so stated and would have included extensive explanation of the reasons for the change. Neither the California nor the uniform comment to this section, however, contains any such discussion. The comments, on the contrary, are brief and state that section 3419, subdivision (3), is merely a codification of prior decisions (U.Com.Code, com. 5) and is entirely consistent with prior California law (Cal. com. 5).

The prior decisions to which the Uniform Commercial Code comment makes reference are presumably a line of cases primarily involving defendants that had acted as investment brokers and had marketed negotiable securities, remitting the consideration received to their customers.[15] The relationships between the representatives and their customers in those cases appear to have been true agency relationships that did not merge into debtor-creditor relationships upon collection of the proceeds. ▮ Unlike the ordinary bank collection transaction, in which the collecting bank and its customer have tacitly agreed a debtor-creditor relationship will emerge upon collection, the ordinary agency transaction gives rise to no such debt when the agent receives funds intended for the principal. Such funds, instead of being mingled, must be kept separate from the agent's own

---

[15]E.g., *Pratt* v. *Higginson* (1918) 230 Mass. 256 [119 N.E. 661, 1 A.L.R. 714]; *Gruntal* v. *National Surety Co.* (1930) 254 N.Y. 468 [173 N.E. 682, 73 A.L.R. 1337]; *First Nat. Bank of Blairstown* v. *Goldberg* (1941) 340 Pa. 337 [17 A.2d 377].

funds and identified as the property of the principal.[16] Thus, when the true agent remits the amount of an instrument to his customer, the agent actually does part with the proceeds. It is to this kind of situation, rather than to the typical bank collection transaction, that section 3419, subdivision (3), appears to be addressed.

■ Defendant collecting banks are, therefore, liable to plaintiffs for the amounts of those instruments received by them as of April 1, 1966. Plaintiffs' negligence, however, bars them from recovering for conversion of instruments received after that date. Plaintiffs do not dispute the trial court's finding that their negligence substantially contributed to the conversion of these instruments, and it appears, viewing the evidence in the light most favorable to the judgment, substantial evidence existed to justify such a finding. Stell had been retained by Ruff in 1963 because of her insolvency and because of litigation instituted against her by several creditors. She had informed Stell at that time that her financial difficulties were primarily due to considerable gambling losses she had sustained. A short time thereafter he hired her as a secretary and bookkeeper. He exercised practically no supervision over her, never reviewed the books, and never checked the bank reconciliation of deposits on the accounts she handled. Only during an annual examination made for tax return purposes by one of Stell's partners were Ruff's records reviewed, and even then, despite the suspicious absence of an entry, her accounts were accepted without checking for accuracy or veracity.

Section 3404 provides: "Any unauthorized signature is wholly inoperative as that of the person whose name is signed unless he ratifies it *or is precluded from denying it. . . .*" (Italics added.) The Uniform Commercial Code comment to this section adds the following explanation: "The words 'or is precluded from denying it' are retained in subsection (1) to recognize the possibility of an estoppel against the person whose name is signed, as where he expressly or tacitly represents to an innocent purchaser that the signature is genuine; *and to recognize the negligence which precludes a denial of the signature.*" (§ 3404, U.Com.Code, com. 4; italics added.) The preclusion language of section 3404 is essentially the same as that of section 23 of the Negotiable Instruments Law (former § 3104 of the Civ. Code). This language had been interpreted to provide for equitable estoppel in order to avoid an unconscionable result.[17] We conclude that the doctrine

[16]Restatement Second of Agency, section 398; Seavey, The Law of Agency (1964) section 153, page 250.

[17]See Beutel, Brannan's Negotiable Instruments Law (7th ed. 1948) section 23, pages 455-464; Britton, Bills and Notes (2d ed. 1961) section 128, pages 343-344. See also Annot.: Payee's prior negligence facilitating forging of indorsement as

must be invoked in the present case. Plaintiffs' negligent failure to discover Ruff's patent defalcations was directly responsible for defendant depositary banks' detrimental change of position in paying Ruff the amount of the instruments. Defendants acted entirely in good faith, and, though their conduct with respect to certain of the instruments may have fallen somewhat below reasonable commercial standards, it was not sufficiently egregious to shift the balance of the scales in plaintiffs' favor.

For the purposes of this case, therefore, plaintiffs are precluded from denying the forged signatures are operative indorsements. Ruff is then deemed to be a "holder," which the code defines as "a person who is in possession of a document of title or an instrument or an investment security drawn, issued or indorsed to him or to his order or to bearer or in blank." (§ 1201, subd. (20).) Good faith payment or satisfaction to the holder of an instrument discharges a party to the extent of his payment or satisfaction, even though the holder may have acquired the instrument by theft. (§ 3603, subd. (1).) Defendant collecting banks are thus discharged on the instruments received by them after April 1, 1966.

*Payor Banks*

■ All but three of the instruments paid by defendant payor banks had been transferred for collection by collecting banks that are also parties to this suit. As indicated above, plaintiffs ratified the collection of these instruments by bringing this action against the collecting banks. This ratification retroactively validates the payor banks' remission of proceeds and provides a defense to an action for conversion. With respect to these instruments, therefore, no liability exists as to any payor bank. Two of the instruments on which this action is based, however, were presented by Ruff directly to the payor, Crocker Bank. The one remaining instrument was collected through banks that are not parties to this action and was also paid by Crocker. With respect to these three instruments no ratification occurred, and we must therefore consider whether Crocker is liable for their conversion.

■ The conclusion of the court below that section 3419, subdivision (3), shields defendant payor banks from liability is erroneous.[18] Even if

precluding recovery from bank paying check, 87 A.L.R.2d 638; Annot: When depositor-drawer of check is "precluded," under Negotiable Instruments Law, § 23, from setting up forgery of indorsement or want of authority against drawee bank, 39 A.L.R.2d 641.

[18]It appears clear that section 3419, subdivision (3), was not intended to apply to nondepositary payor banks. The fact that the provision expressly includes depositary and collecting banks but does not mention payor banks creates a strong negative

we assume arguendo that section 3419, subdivision (3), was intended to apply to payor banks, the provision would afford them no protection in cases such as this. As we stated above, the amounts a payor bank transfers to a collecting bank on a forged indorsement do not constitute the proceeds of the instrument, unless the true owner ratifies the collection. It follows that, absent such ratification, the proceeds remain in the hands of the payor bank. The payor bank is, consequently, liable for the full amount of the instrument notwithstanding section 3419, subdivision (3).

It is not now necessary for us to undertake an extensive analysis of the applicability of section 3419, subdivision (3), to payor banks. ▮ Inasmuch as the three instruments that concern us were all transferred by Ruff after April 1, 1966, plaintiffs' negligence stands as a bar to recovery. Section 3406 states that "Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

The record contains substantial evidence to support the trial court's finding that Crocker acted in good faith and in accordance with reasonable commercial standards in handling the three instruments. Ruff held an account with Crocker, and at the time the account was opened, she had been introduced to the bank by one of its established customers. Nothing on the face of the instruments would have led the bank to suspect they were irregular in any way. A single branch of a large bank, as the testimony indicated, may handle several thousand instruments bearing third

---

inference in this regard. The applicability of the term "representative" to nondepositary payor banks is also doubtful. It is significant that the extensive commentary on section 3419 by numerous experts in the law of commercial paper apparently does not contain a single suggestion that the defense of section 3419, subdivision (3), is available to nondepositary payor banks. Some commentators have declared outright that the defense is not available. (E.g., 6C Willier & Hart, U.C.C. Reporter-Digest, § 3-419, A2; *Allocation of Losses from Check Forgeries Under the Law of Negotiable Instruments and The Uniform Commercial Code* (1953) 62 Yale L.J. 417, 471.) Others arrive at the same conclusion by implication in discussing the defense only in the context of depositary and collecting banks. (E.g., Advanced ALI-ABA Course of Study on Banking and Secured Transactions Under the Uniform Commercial Code (ALI 1968) p. 64; Bailey, The Law of Bank Checks (4th ed. 1969) § 15.14, pp. 496-501; Clark & Squillante, The Law of Bank Deposits, Collections and Credit Cards (1970) pp. 141-147; Cosway, *Negotiable Instruments—A Comparison of Washington Law and the Uniform Commercial Code* (1968) 43 Wash.L.Rev. 499, 543; 2 New York Law Revision Commission Study of the Uniform Commercial Code (1955) p. 1079; O'Malley, *Common Check Frauds and the Uniform Commercial Code* (1969) 23 Rutgers L.Rev. 189, 231.)

party indorsements in a single day. Considering this burden, it would be commercially unreasonable to expect payor banks to undertake foolproof efforts to verify ostensibly valid indorsements. Crocker's diligence with respect to the check received through bank collection channels is, of course, particularly evident, inasmuch as Crocker apparently received the instrument with all prior indorsements guaranteed by the collecting banks. Having acted in good faith and in accordance with reasonable commercial standards, Crocker is therefore entitled to invoke the defense of section 3406.[19]

*Conclusion*

We conclude that defendant collecting banks are liable for the amount of any instrument received by them prior to April 1, 1966. The record reveals that only 7 of the 23 misappropriated checks were received by that date, and each of them was taken for collection by defendant Union Bank. The total amount of these seven checks is $2,791.11. The judgment is therefore reversed with directions to enter judgment against Union for $2,791.11 plus the appropriate interest due on the amounts of each of the seven checks. With respect to the other defendants the judgment is affirmed. The parties shall bear their own costs on appeal.

Wright, C. J., McComb, J., Tobriner, J., Burke, J., Sullivan, J., and Files, J.,* concurred.

Appellants' petition for a rehearing was denied April 19, 1973.

---

[19]We find no merit to plaintiffs' additional contention that the findings of the trial court were insufficiently specific to support the judgment in that the court failed to state precisely what procedures constitute reasonable commercial practices. After outlining the procedures defendant banks had followed, the court concluded that they had acted in accordance with reasonable commercial standards. These findings are sufficient under Code of Civil Procedure section 634 to assure adequate review of the trial court decision. (*Whitney Inv. Co.* v. *Westview Dev. Co.* (1969) 273 Cal. App.2d 594, 604 [78 Cal.Rptr. 302].)

*Assigned by the Chairman of the Judicial Council.