Filed 1/9/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SHELDON FONG,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>EAST WEST BANK,<br><br>      Defendant and Respondent. | A146028 & A147048<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-13-527706) |

Plaintiff Sheldon Fong is an octogenarian real estate investor who sought to help some younger friends establish a real estate business. He borrowed money in his own name and stood behind two loans that he helped the new business procure from defendant East West Bank (Bank). When some of these transactions ended badly, Fong brought this action, alleging conversion and financial abuse of an elder under Welfare and Institutions Code section 15610.30 (Elder Abuse Act). The trial court granted the Bank's motion for summary judgment. We find a triable issue of material fact as to one of the challenged conversions and therefore reverse the grant of summary judgment.

## FACTS AND PROCEDURAL BACKGROUND

Except as otherwise noted, the following facts are undisputed.

Fong was born in China in 1931, and moved to San Francisco as a young man. He never received a degree, but learned various construction and building trades, operated his own building maintenance company, and invested profitably in San Francisco real estate. By 2010, he owned more than 20 properties, encumbered by mortgages from various banks but representing close to $20 million in equity.

Fong had a banking relationship with the Bank, where he had over $3.5 million dollars on deposit. The Bank had acquired certain assets and liabilities of United

1

Commercial Bank (UCB) in November 2009, when the Federal Deposit Insurance Corporation placed UCB into receivership. Among these were Fong's money market account, his certificate of deposit account registry service (CDARS) account, and a loan—evidenced by a promissory note in the original principal amount of $989,250—that Fong had taken out in September 2009 (first Fong loan). The collateral for the first Fong loan was Fong's CD account in the amount of $1,000,000.

Fong asserts that he did not understand the papers he signed to obtain the first Fong loan, and that he neither needed nor wanted a bank loan from UCB. But Fong does not explain what he thought he was doing when he signed a three-page document entitled "Promissory Note," with a heading that included a "Loan Date" and a "Loan No.," and that prominently identified "Borrower: Sheldon Fong" and "Lender: United Commercial Bank." English is not his first language, but Fong has learned English over the years and chose to testify without an interpreter at his deposition. Fong's papers assert that he "suffers from age-related comprehension problems," but the evidentiary support for this statement is simply Fong's declaration that he found the Bank managers' "advice on investment options . . . confusing."

On August 26, 2010, as the first Fong loan was coming due, Fong signed documents changing its terms to extend the loan's maturity date and require monthly interest payments. Fong executed a single-page "Change in Terms Agreement" that clearly and repeatedly identifies him as the "Borrower." He also executed a single-page "Disbursement Request and Authorization" form, which again clearly and repeatedly identifies him as the "Borrower," to establish automatic monthly interest payments on the loan from his money market account. Fong would later stop these automatic payments and default on the loan.

Also in August 2010, just two weeks before the parties changed the terms on the first Fong loan, Fong signed documents taking a second loan, for $1.5 million (second Fong loan). For this second loan, too, Fong signed a document authorizing automatic monthly interest payments to be deducted from his money market account. When the second Fong loan came due in August 2011, it was paid off with the proceeds of a loan

2

that the Bank extended to a California corporation called United Three Groups, Inc. (UTGI).

UTGI was a company formed by a group of young investors who were family friends of Fong, and whom Fong was seeking to assist in establishing a real estate investment business. In January 2011, Fong loaned UTGI $1.5 million of his own funds, which documents show that UTGI repaid in August 2011, by taking out its own $1.5 million loan from the Bank (first UTGI loan) and using the proceeds to pay off the second Fong loan. Fong assisted UTGI in getting the first UTGI loan by providing collateral for and guaranteeing the loan. He signed an "Assignment of Deposit Account" and a "Commercial Pledge Agreement" pledging his money market account and his CDARS account as collateral, and he signed a commercial guaranty that obligated him to pay, on an ongoing basis, any loan obligations that UTGI did not. These documents were all executed as part of the initial loan transaction, and a couple of weeks later Fong signed a single-page form also authorizing automatic payments on the first UTGI loan directly from his own money market account.

In October 2011, Fong helped UTGI get a second loan from the Bank for $1.5 million, a line of credit that in December 2011, was modified and extended to $2 million (second UTGI loan). The collateral for this loan was several deeds of trust covering parcels of San Francisco real estate that Fong had conveyed to UTGI. Fong also executed a commercial guaranty as part of the second UTGI loan transaction, and a one-paragraph "Guarantor Consent" reaffirming that obligation during the December 2011 loan modification. The first $1.5 million in proceeds from the second UTGI loan went directly to Fong, payable through a cashier's check on November 16, 2011. Also in December 2011, UTGI directed the Bank that Fong was to become the only authorized signer on UTGI's checking account. Asked what his role at UTGI was, Fong explained, "I am like a banker to support them. When they are in trouble, they come to me."

In January 2012, the Bank says it received instructions from Fong to close his CDARS account and use the proceeds to pay off the $1.5 million first UTGI loan. A bank manager states that in her presence, Fong signed a type-written letter authorizing the

Bank to close his CDARS account, and on January 31, 2012, she emailed two of Fong's business associates to report that Fong had given "written and verbal instruction on Friday, 1/27/2012" that the CDARS account be closed and the first UTGI loan paid off. The email went to Irene Wong, the chief executive officer of UTGI, and Douglas Kwan, who worked with UTGI in another capacity. Both had accompanied Fong when he came into the Bank to sign many of the papers relating to the transactions at issue in this case. The email was not addressed to Fong himself, but Fong neither types nor uses a computer. In response to her email, the bank manager received another short type-written letter that appears to bear Fong's signature and to authorize the Bank to take $1,503,162.50 from his money market account (where the proceeds of Fong's CDARS account would go on closing) to pay off the first UTGI loan. She also received a "Loan Advance/Repayment Request" form, appearing to bear Fong's and Irene Wong's signatures and to authorize the same transaction. These documents are dated January 31, 2012, and January 27, 2012, respectively.

Fong insists that the three documents purporting to authorize repayment of the first UTGI loan are forgeries, and that the first time he saw the letters appearing to bear his signature was when they showed up as attachments to the Bank manager's declaration in support of summary judgment. But he does not dispute the authenticity of, or otherwise attempt to explain, the email exchange among officers of the Bank, Irene Wong, and Douglas Kwan in which the Bank lays out the particulars of the transaction (including that the money will move through Fong's money market account), and Wong then responds with "Attached is my authorization to pay off the [loan] as per Sheldon's instructions." Nor did Fong immediately register concern when he received the January 2012 statement for his money market account, which recorded for January 31, 2012, both a "Credit Memo" of $1,532,897.78 for "CDARS Early Close" and a "Debit Memo" of $1,503,162.50 with a specified loan number.

This same money market account statement also records three automatic loan payments for dates in January 2012, in amounts that add up to $17,826.85. The money market account statement does not list the loan numbers, but other bank records make it

4

possible to tie these payments to three different loans. Statements show that the largest payment, for $10,166.67, was the monthly payment on the second UTGI loan. Another payment, for $4,262.50, was for the first UTGI loan. And a third payment, for $3,397.68, was for the first Fong loan. The February 2012 money market account statement had comparable deductions for the first UTGI loan and first Fong loan.

A few months later, Fong stopped making payments on the first Fong loan. On May 7, 2012, the Bank sent him a letter stating that the April payment was delinquent and that failure promptly to pay delinquent amounts would result in a default. On May 25, 2012, the Bank followed up with a "final opportunity to repay" letter, warning that a failure to pay by June 5, 2012, would cause the Bank "to liquidate the hold amount of $1,000,000 under the CD account" pledged as collateral. In response to the first of these letters, Fong attempted to get an explanation from the Bank and then hired a lawyer. The Bank proceeded with the threatened liquidation.

On January 4, 2013, Fong filed a complaint against the Bank, UTGI, his own lawyer, and related defendants, alleging a total of 13 causes of action. An amended complaint followed, as did, after successive demurrers, a second and a third amended complaint. On October 1, 2013, the trial court sustained without leave to amend a demurrer to all but two counts of the operative pleading, the third amended complaint. Causes of action for conversion and for financial abuse of an elder, both against the Bank only, remained.

The cause of action for conversion alleges several wrongful transfers. First, it alleges that on November 16, 2011, the Bank transferred $1.5 million "from [p]laintiff's CD account 8619001525 without his direction, authorization, or consent." In fact, this account belonged to UTGI , and, as Fong admits, UTGI authorized the withdrawal of this sum for the purpose of issuing a cashier's check made payable to Fong. The "Second Wrongful Transfer" alleged is a combination of transfers. Fong challenges the Bank's June 19, 2012 liquidation of his "CD account 18792815" containing more than $1 million, ostensibly to pay off a non-existent promissory note held by Wachovia Bank, although Bank documents show it was liquidated because Fong defaulted on the first

5

Fong loan, for which it had been pledged as collateral. Fong also challenges as part of the second wrongful transfer, four of the loan payments made from his money market account that were recorded in the January and February 2012 account statements. Finally, Fong's "Third Wrongful Transfer" challenges the Bank's January 31, 2012 liquidation of his CDARS account containing more than $1.5 million.

The cause of action for elder abuse relies primarily on these same allegedly wrongful transfers, but also includes the interest Fong paid the Bank on both the first and second Fong loans.

The Bank moved on February 18, 2015, for summary judgment. Fong opposed the motion, at first by filing only some of the required documents. On April 22, 2015, he filed a "Declaration of Sheldon Fong in Opposition to Motion for Summary Judgment," which explained that English was not his first language, that he "was not experienced in banking transactions of the type presented to me," that the meaning of the documents he had signed "was not explained to me in a way that I could understand fully," and that he had never before seen the letters purporting to bear his signature and directing the Bank to close his CDARS account and pay off the first UTGI loan. At the same time, Fong filed a "Plaintiff's Response to Separate Statement of Undisputed Material Facts in Opposition to Motion for Summary Judgment," responding to some but not all of the facts in the separate statement accompanying the motion for summary judgment. Later, after hearing on the summary judgment motion was continued, Fong filed a brief opposing the motion, and the Bank had another opportunity to reply.

On June 1, 2015, the trial court entered an order granting the Bank's motion for summary judgment. The trial court found that the Bank's evidence shifted the burden, and that Fong "failed to submit competent and admissible evidence to create a triable issue of fact." The trial court also determined that as the "prevailing party" the Bank was "entitled to its reasonable attorneys' fees and costs," which it set on October 8, 2015, at $202,069.75 and $6,290.05, respectively. Judgment in the Bank's favor was entered originally on June 12, 2015, and modified on November 23, 2015, to add the award of fees and costs.

Fong timely appealed the original judgment entered on the order granting summary judgment (case No. A146028), and the amended judgment adding fees and costs (case No. A147048), and this court consolidated the two appeals.

## DISCUSSION

Because Fong appeals a grant of summary judgment, "we must 'independently examine the record in order to determine whether triable issues of fact exist to reinstate the action.' " (*O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 284.) This is de novo review, in which we must " 'view the evidence in the light most favorable to the plaintiff,' " liberally construing Fong's evidence and strictly scrutinizing the Bank's. (*Ibid.*)

As the moving party, the Bank "bears the burden of persuasion that there is no triable issue of material fact and that [it] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845.) The Bank also bears the initial burden of production, but if it makes "a prima facie showing of the nonexistence of any triable issue of material fact" then the burden shifts to Fong to produce contrary evidence. (*Id.* at p. 850.) A triable issue of material fact is one that "would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at pp. 845, 850.)

" 'Conversion' is the wrongful exercise of dominion over the property of another." (*Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal.App.4th 1383, 1387 (*Madatyan*).) To prove conversion, a plaintiff must establish three elements: (1) "plaintiff's ownership or right to possession of property," (2) "defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession," and (3) damages. (*McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1491; see also *Madatyan*, at p. 1387 ["Conversion is a strict liability tort," where issues of the defendant's good or bad faith are usually immaterial]; see also *Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208, 209 (*Welco*) ["Money may be the subject of conversion if the claim involves a specific, identifiable sum"].)

7

The Bank makes three arguments on the conversion claims in support of its summary judgment. First, the Bank argues that as a matter of law it cannot be liable for conversion in a claim brought by its own depositor. Second, it argues that Fong's failure to comply with the law's procedural requirements for summary judgment constitutes sufficient grounds to affirm the trial court. And third, the Bank argues that because the challenged transfers were all authorized by the relevant account holders, they are not actionable. We disagree with the Bank on all three points and accordingly reverse the summary judgment.

## A. A Bank Can Be Liable for Converting Its Depositor's Funds

The Bank argues that Fong's conversion claim stumbles on the first element—that a bank cannot convert its depositor's funds because deposited funds are the property of the bank, not the depositor. The Bank relies on three old cases for this proposition. The oldest does indeed articulate this principle, although in the anomalous context of explaining that a bank has no fiduciary relationship with an ordinary depositor. (See *Smith's Cash Store v. First Nat'l Bank* (1906) 149 Cal. 32, 35.) The second case does not stand for this proposition but for a much narrower one, that where a bank has no notice of the fact that funds a customer has deposited with it are being held in trust for a third party, the bank does not become liable to the beneficial owner of those funds when it sets them off against a debt the depositor previously accrued. (*Arnold v. San Ramon Valley Bank* (1921) 184 Cal. 632, 636-637.) The Bank's third case, *Metropolitan Life Ins. Co. v. San Francisco Bank* (1943) 58 Cal.App.2d. 528, 534 (*Metropolitan Life*), likewise does not establish the proposition for which the Bank cites it, although for reasons that take some explaining.

Plaintiff Metropolitan Life Insurance Company had an account with The Bank of California (depository bank), and through a rogue employee wrote a series of checks off this account to fictitious persons, which checks the employee cashed at The San Francisco Bank (collecting bank). (*Metropolitan Life*, *supra*, 58 Cal.App.2d. at pp. 529-530.) The San Francisco Bank then presented the checks to The Bank of California for payment, and the corresponding funds were debited from the insurance company's

8

account. (*Id*. at p. 530.) The insurance company sued both banks to recover the sums paid out on the forged checks, and both banks interposed demurrers. The Bank of San Francisco's demurrer was sustained, and plaintiff appealed. (*Ibid*.) This court affirmed. As to the claim that the collecting bank had converted plaintiff's money, we said, "[p]laintiff, after depositing its money with The Bank of California, was no longer the owner or entitled to the possession of any specific money which was the subject of conversion and when The Bank of California paid the amount appearing on the face of the checks to The San Francisco Bank, it paid out its own money and not that of plaintiff." (*Id*. at p. 534.) But this explanation—and our holding—were specific to the collecting bank. We also "assumed for the purposes of this discussion that plaintiff, as drawer, was entitled to recover against The Bank of California, as drawee" in a timely filed action. (*Id*. at p. 532.) And indeed, the Bank of California's demurrer had been overruled, except as to those causes of action barred by the statute of limitations, and that decision was not appealed. (*Id*. at pp. 530-531.) Thus, the Bank is simply wrong that *Metropolitan Life* "rejected the notion that deposited funds can be tortiously converted *by the depository bank*." (Italics added.) In fact, *Metropolitan Life* assumes the opposite.

Cases since *Metropolitan Life, supra,* 58 Cal.App.2d 528, make clear that there is no special rule preventing a depositor from pursuing a conversion action against the bank that holds his or her money. *Cooper v. Union Bank* (1973) 9 Cal.3d 371 addresses a factual pattern similar to that in *Metropolitan Life*. Plaintiff law partnership had filed a conversion action against depository and collecting banks when its bookkeeper forged endorsements on, and cashed, a series of checks intended for the firm. (*Cooper*, at p. 375.) The Supreme Court held that a depository (also called payor) bank is "strictly liable to the true owner if it pays an instrument on a forged indorsement," unless the depository bank has a valid defense (*id*. at pp. 381, 384-386), and that collecting banks, too, are "liable for conversion unless they can establish a defense." (*Id*. at p. 376.) (See also *Gil v. Bank of America*, N.A. (2006) 138 Cal.App. 1371, 1378 (same).) The former section of the California Uniform Commercial Code relied upon in *Cooper*, now updated as section 3420, expressly states, "The law applicable to conversion of personal property

9

applies to instruments," which includes certificates of deposit. (Cal. U. Com. Code §§ 3420, 3104.)

In other contexts, too, courts have found an action for conversion proper when the property at issue was some form of financial interest. For example, an equitable lien in insurance proceeds "is a property interest that can be converted. (*Madatyan*, *supra*, 209 Cal.App.4th at p. 1388.) Amounts charged against another's credit card without authorization can give rise to a cause of action for conversion. (*Welco, supra,* 223 Cal.App.4th at pp. 215-216.) Monies a broker collected on behalf of an apartment house owner but failed to account for may be a conversion. (*Haigler v. Donnelly* (1941) 18 Cal.2d 674.) Even misappropriation of a net operating loss without compensation has been held to constitute a conversion. (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 124-125.) In general, "conversion has been held to apply to the taking of intangible property rights when 'represented by documents, such as bonds, notes,' " and "accounts showing amounts owed." (*Welco*, at p. 209; see also *Fremont Indemnity Co.*, at p. 125; *Kremen v. Cohen* (9th Cir. 2003) 337 F.3d 1024, 1033.)

In sum, the Bank fails to establish that Fong's conversion claims fail simply because he brings this action against the bank where he kept accounts and borrowed money.

## B. Like the Trial Court, We Decide This Motion on its Merits

The Bank is correct that Fong failed to comply with the law's procedural requirements for summary judgment, but unavailing in its argument that we affirm the judgment on this basis.

True, Fong did not fully comply with the requirement that a party opposing a motion for summary judgment file "a separate statement that responds to each of the material facts contended by the moving party to be undisputed, indicating whether the opposing party agrees or disagrees that those facts are undisputed." (Code Civ. Proc., § 437c, subd. (b)(3).) His response to the separate statement set forth his agreement or disagreement with only some, not all, of the Bank's enumerated facts. Also true, Fong

10

failed initially to comply with rule 3.1350 of the California Rules of Court because he did not timely file his memorandum in opposition to the motion for summary judgment.

But the trial court decided this case on the merits. After granting a continuance to allow for complete briefing, the trial court decided that the Bank had "shifted its burden" and Fong had "failed to submit competent and admissible evidence to create a triable issue of fact," also noting Fong's failure to comply with the California Rules of Court. The Bank cites no case where an appellate court has affirmed summary judgment on the basis of such procedural defects after the trial court reached the merits of a summary judgment motion. Instead, the Bank relies on the text of Code of Civil Procedure section 437c, subdivision (b)(3), which states that failure to comply with the separate statement requirement "may constitute a sufficient ground, in the court's discretion, for granting the motion." (*Ibid*.) Assuming we have the discretion to affirm the trial court's grant of summary judgment on that ground, we decline to exercise it. Fong's response to the separate statement fails to admit or deny few of the enumerated facts that turn out to be material to disposition of this motion, and we see no reason not to decide it on its merits.

## C. As to the "Third Wrongful Transfer" There is a Triable Issue of Material Fact

Fong alleges that several transfers are wrongful acts of conversion. The Bank argues that all were authorized by the account holders, so the Bank did nothing wrong. We do not consider the transactions that Fong denominates the first and second wrongful transfers, because we find as to the third allegedly wrongful transfer that a triable issue of material fact remains.

The Bank has produced evidence making out a prima facie case that the "Third Wrongful Transfer" was not wrongful and that no conversion occurred, but Fong's evidence raises a triable issue of material fact as to the genuineness of documents on which the Bank relies. The Bank's evidence tends to establish that it received instructions from Fong at the end of January 2012 to close his CDARS account and use the proceeds, routing them through his money market account, to pay off the $1.5 million first UTGI loan. In addition to a manager's declaration and corroborating email to this

11

effect, the Bank offers two short, type-written letters appearing to bear Fong's signature and a loan advance/repayment request form appearing to bear both Fong's and Irene Wong's signatures, all authorizing aspects of the transaction. Fong disputes the authenticity of his signature on all three documents, declaring that he had never seen them before they appeared as evidence in this case. He also points out that of the three documents, the only one the bank manager claims to have witnessed him signing is a letter that authorizes closing the CDARS account but does not mention using the proceeds to pay off the first UTGI loan. Apparently in response to the Bank's follow-up email communications, to which Fong was not a party, the Bank received the other two documents that further authorize repayment of the second UTGI loan from Fong's personal accounts.

The genuineness of Fong's signature on the documents authorizing repayment of the loan is a material issue of fact. "Conversion is a strict liability tort," so the Bank cannot defeat the claim on the grounds that it accepted a forged signature in good faith. (*Madatyan, supra,* 209 Cal.App.4th at p. 1387.) Financial institutions can be liable to their depositors for transferring money out of their accounts on forged instruments. (See, e.g., *Cooper v. Union Bank*, *supra*, 9 Cal.3d at p. 375; *Metropolitan Life*, *supra*, 58 Cal.App.2d at p. 532.) In other contexts, too, a party that transfers plaintiff's intangible property on the basis of a forged letter can be held liable for conversion. (*Kremen v. Cohen*, *supra*, 337 F.3d at p. 1035 (domain name transferred).)

Because a dispositive fact remains in dispute, summary judgment is not proper. (See *O'Riordan v. Federal Kemper Life Assurance Co., supra*, 36 Cal.4th at p. 289.) The Bank did not move for summary adjudication, so we need not consider whether any triable issue of material fact has been raised as to the other allegedly wrongful transfers or to the Elder Abuse Act cause of action.

Also, because the Bank is no longer the "prevailing party" in this action, we must reverse the award of fees and costs in its favor.

## DISPOSITION

The amended judgment in favor of the Bank granting summary judgment, attorneys' fees, and costs, is reversed and Fong is awarded costs on appeal.

_____
Tucher, J.*

We concur:


_____
Stewart, Acting P.J.


_____
Miller, J.


*Fong v. East West Bank* (A146028 & A147048)


\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                         San Francisco County Super. Ct.

Trial Judge:                        Hon. Ronald E. Quidachay

Attorneys for Appellant:         Law Offices of Ruben P. Ruiz
Ruben P. Ruiz
Lesley E. Williams

Attorneys for Respondent:      French & Lyon
Patricia H. Lyon
Mary Ellmann Tang
Michael C. Starkey
French Lyon Tang