No. 78,687

JERRY C. KING, *Appellee/Cross-Appellant*, v. JOHN WHITE, *Defendant*, COMMERCE BANK, N.A., *Appellant/Cross-Appellee*, MICHIGAN NATIONAL BANK and UMB BANK, NORTHWEST, *Defendants*, AUTO-OWNERS INSURANCE COMPANY, *Appellant/ Cross-Appellee*, and AMERICAN FAMILY MUTUAL INSURANCE COMPANY, *Appellee/Cross-Appellant*.

(962 P.2d 475)

628

Opinion filed July 10, 1998.

*Richard M. Beheler*, of Blackwell Sanders Matheny Weary & Lombardi LLP, of Kansas City, Missouri, argued the cause, and *Benjamin F. Mann*, of the same firm, was with him on the briefs for appellant/cross-appellee Commerce Bank, N.A.

*Charles H. Stitt* and *Diane M. Breneman*, of Shaffer Lombardo Shurin, of Kansas City, Missouri, argued the cause, and *Gregory P. Forney*, of the same firm, was on the briefs for appellant/cross-appellee Auto-Owners Insurance Company.

*Todd N. Thompson*, of Lawrence, argued the cause and was on the brief for appellee/cross-appellant American Family Mutual Insurance Company.

*Mark A. Rohrbaugh*, of Overland Park, argued the cause and was on the brief for appellee/cross-appellant Jerry C. King.

The opinion of the court was delivered by

LARSON, J.: In this case we must decide who suffers the loss after an attorney improperly obtained settlement drafts from two insurance companies, forged his client's endorsement on the checks, deposited the checks in his trust account, and then converted the funds. The question arises in the context of a suit for conversion by the client, Jerry C. King, against his Kansas attorney, John L. White, the insurance companies Auto-Owners Insurance Company (Auto-Owners) and American Family Mutual Insurance

(American Family), and the depository bank, Commerce Bank, N.A. (Commerce).

The trial court granted summary judgment in favor of King against all defendants but ultimately held that the loss falls upon Commerce, although granting judgment against White, who is currently incarcerated. The trial court further determined that King was only entitled to recover a two-thirds interest in the drafts due to his contingency fee agreement with White.

The appeals and cross-appeals raise numerous issues, most of which pertain to interpretations of Article 3 of the Uniform Commercial Code (UCC): (1) Does the impostor defense of K.S.A. 84-3-404(a) protect a depository bank that paid the instruments in good faith? (2) If the impostor defense is applicable, does it also protect a drawee of an instrument who pays in good faith? (3) Does King's ratification of the settlement agreements also ratify White's actions in endorsing and depositing the instruments representing the settlement proceeds? (4) May the true payee of a draft sue the drawee for paying on a forged endorsement when the payee has also sued the collecting bank? (5) Does Article 3 of the UCC permit conversion liability for nonbank drawees? (6) May King recover for conversion of a draft payable to the estate of King's wife? (7) Is King required to bear the loss occasioned by the wrongful conduct of his agent? (8) Is an attorney entitled to a contingency fee after entering into an unauthorized settlement agreement and fraudulently endorsing and converting the settlement proceeds?

## Factual statement

Jerry C. King and his wife, Judith, were involved in an automobile accident in January 1994. King sustained personal injuries in the accident, but his wife was killed. King employed White to represent him in his claims for personal injuries and wrongful death.

Although King and White did not enter a written agreement regarding White's representation, the essential terms of the representation are not disputed. White was to pursue King's claims or causes of action with respect to possible recovery against the State of Alabama, the driver of the other vehicle, and the owner of the

vehicle. In exchange, White was to receive one-third of the amounts recovered.

White negotiated a policy-limits settlement of $25,000 for King's wrongful death claims and $3,500 for his personal injury claims with Auto-Owners, the insurance carrier of the driver of the other vehicle involved in the accident. White also negotiated a settlement with American Family for the full amount of underinsured motorist benefits available under King's policy. White represented to both insurance companies that he was authorized to act on King's behalf, although King had not authorized settlement with either party and was unaware that settlements had been reached.

Auto-Owners drew a draft payable through Michigan National Bank (MNB) in the amount of $28,500, copayable to King, individually and as surviving spouse of Judith, and to White. American Family drew a draft payable through United Missouri Bank, Northwest (UMB) in the amount of $25,000, copayable to White and the Estate of Judy King.

White received the drafts, endorsed his name, forged King's signature on the drafts without King's knowledge or consent, and deposited the drafts into his trust account at Commerce. Commerce granted provisional credit to White's trust account and presented them to the "payable through" banks for final payment. Auto-Owners and American Family authorized payment of the drafts. White later withdrew the proceeds of the drafts from his Commerce trust account and converted them to his own use. White did disburse $2,257.84 to King for his share of the $3,500 personal injury settlement after deducting his contingency fee and expenses, but King remained unaware of the remaining settlement amounts.

After King discovered these events, he filed suit alleging counts of fraud against White and conversion against White, Commerce as depository bank, MNB and UMB as drawee banks, and American Family and Auto-Owners as drawers or nonbank drawees. White confessed judgment, and judgment was entered against him. The remaining defendants filed cross-claims and motions to dismiss, and Commerce, the insurance companies, and King all moved for summary judgment. King dismissed his claims against

MNB and UMB after it was established they were collecting banks rather than drawee banks.

In ruling on the motions for summary judgment, the trial court found Commerce was the depository bank for both drafts pursuant to K.S.A. 84-4-105(2); MNB and UMB were intermediary or collecting banks pursuant to K.S.A. 84-4-105(4) and (5) and K.S.A. 84-4-106(a)(1); Auto-Owners and American Family were makers/drawers pursuant to K.S.A. 84-3-103(3) and (5) and also drawees pursuant to K.S.A. 84-3-103(2) and K.S.A. 84-4-104(a)(8).

The trial court ruled that K.S.A. 84-3-404, pertaining to impostors, did not govern the liabilities of the case because White did not act as an impostor within the meaning of the statute. The court held Commerce liable to King pursuant to K.S.A. 84-3-420(a) as a depository or payor bank which took an instrument bearing a forged endorsement. The court also held the insurance companies liable to the payee due to their status as drawees pursuant to K.S.A. 84-3-420(a). The court found MNB and UMB not liable through their status as collecting banks.

The court determined that the extent of King's interest in the forged instruments was the amount of the drafts less White's attorney fees. The court also found that although King's action for conversion of the drafts may constitute ratification of the settlement agreements, it did not constitute ratification of White's separate wrongful act of forging King's endorsement and converting the draft amounts. The court further rejected a claim that King must bear the loss occasioned by the wrongful conduct of his agent and a claim that King released one of the insurance companies. The court concluded King was not required to elect his remedy and was not barred from pursuing actions against the remaining defendants after suing White and the collecting banks.

The court found that Commerce, Auto-Owners, and American Family were entitled to indemnity from White and that the insurance companies were entitled to indemnity from Commerce pursuant to K.S.A. 84-3-417, the presentment warranty statute. The court also found that Commerce and the insurance companies were jointly and severally liable to King on the drafts pursuant to K.S.A. 84-3-116(a), and each is entitled to contribution pursuant

to 84-3-116(b). The court granted judgment of $33,333.33 against Commerce and $16,666.66 against both Auto-Owners and American Family.

Commerce and Auto-Owners appeal, and American Family cross-appeals. King also cross-appeals the determination that White was entitled to one-third of the proceeds from the settlement checks. We have jurisdiction under K.S.A. 60-2102(a)(4) of a case transferred to this court pursuant to K.S.A. 20-3018(c).

*Standard of review*

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." K.S.A. 60-256(c). We have said:

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case." *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260, 891 P.2d 435 (1995).

The issues in this case involve interpretations of Article 3 of the Kansas UCC and other questions of law over which we have unlimited review. See *Marais des Cygnes Valley Teachers' Ass'n. v. U.S.D. No 456*, 264 Kan. 247, 249, 954 P.2d 1096 (1998)

In *Estate of Soupene v. Lignitz*, 265 Kan. 217, 220, 960 P.2d 205 (1998), we said:

" 'We initially note our fundamental rule of construction that it is the intent of the legislature, where it can be ascertained, which governs the construction of a statute. See *City of Wichita v. 200 South Broadway*, 253 Kan. 434, 436, 855 P.2d 956 (1993). The legislature is presumed to have expressed its intent through the language of the statutory scheme it enacted. We will not read into legislation provisions which do not there exist. See *Joe Self Chevrolet, Inc. v. Board of Sedgwick County Comm'rs*, 247 Kan. 625, 633, 802 P.2d 1231 (1990).' *Marais des Cygnes Valley Teachers' Ass'n. v. U.S.D. No. 456*, 264 Kan. 247, 954 P.2d 1096 (1998).

"Although appellate courts will not speculate as to the legislative intent of a plain and unambiguous statute, *State v. Lawson*, 261 Kan. 964, 966, 933 P.2d 684 (1997), where the construction of a statute on its face is uncertain, the court may

examine the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under various suggested interpretations. *Brown v. U.S.D. No. 333*, 261 Kan. 134, 142, 928 P.2d 57 (1996).

" 'Ordinarily, there is a presumption that a change in the language of a statute results from the legislative purpose to change its effect, but this presumption may be strong or weak according to the circumstances, and may be wanting altogether in a particular case.' *Board of Education of U.S.D. 512 v. Vic Regnier Builders, Inc.*, 231 Kan. 731, 736, 684 P.2d 1143 (1982). However, we have also stated: 'Ordinarily, courts presume that, by changing the language of a statute, the legislature intends either to clarify its meaning or to change its effect.' (Emphasis added.) *Watkins v. Hartsock*, 245 Kan. 756, 759, 783 P.2d 1293 (1989) (citing *U.S.D. 512*, 231 Kan. 731)."

## *Impostor defense*

Commerce first argues the endorsement of White is that of an impostor posing as King's agent and is therefore effective as King's endorsement to Commerce as a payor who paid in good faith. Commerce relies upon the amended version of K.S.A. 84-3-404 to support its position, which in applicable part provides:

"(a) If an impostor, by use of the mails or otherwise, induces the issuer of an instrument to issue the instrument to the impostor, or to a person acting in concert with the impostor, by impersonating the payee of the instrument or a person authorized to act for the payee, an endorsement of the instrument by any person in the name of the payee is effective as the endorsement of the payee in favor of a person who, in good faith, pays the instrument or takes it for value or for collection."

The Official UCC Comment to 84-3-404 states:

"Subsection (a) changes the former law in a case in which the impostor is impersonating an agent. Under former Section 3-405(1)(a), if Impostor impersonated Smith and induced the drawer to draw a check to the order of Smith, Impostor could negotiate the check. If Impostor impersonated Smith, the president of Smith Corporation, and the check was payable to the order of Smith Corporation, the section did not apply. See the last paragraph of Comment 2 to former Section 3-405. In revised Article 3, Section 3-404(a) gives Impostor the power to negotiate the check in both cases."

The Kansas Comment to this statute reads:

"This section codifies the 'impostor' and 'fictitious payee' rules, throwing the loss for forged indorsements on the issuer who was duped into issuing an instrument to the wrong person. These rules are a codification of variations of the

general negligence provisions of 84-3-406. . . . If the section is successfully invoked, the loss arising from a forged indorsement is shifted away from later 'holders' and on to the issuer. Note that the 'impostor' rule has been expanded to cover situations where a misrepresentation of agency is involved and the instrument is made payable to the real principal. The 'fictitious payee' rule has been broadened to include indorsements which are substantially similar.

"Subsection (a). The rule stated in this subsection validates the indorsement where the issuer intended the instrument to go to that impostor him or herself, or as agent of the named payee, or a confederate. The key words in the statute are 'to issue the instrument to the impostor, or to a person acting in concert with the impostor.' The controlling factor is whether the issuer intended the person receiving the instrument to receive it. The subsection can only be invoked by a good faith payor or transferee for value."

Prior to the enactment of the revised Article 3 in 1991, the impostor defense was codified at K.S.A. 84-3-405(1)(a) (Ensley 1983), which provided:

"(1) An indorsement by any person in the name of a named payee is effective if

(a) an impostor by the use of the mails or otherwise has induced the maker or drawer to issue the instrument to him or his confederate in the name of the payee."

The Official UCC Comment to this section states:

" 'Impostor' refers to impersonation, and does not extend to a false representation that the party is the authorized agent of the payee. The maker or drawer who takes the precaution of making the instrument payable to the principal is entitled to have his indorsement."

The impostor defense as it existed prior to the 1991 revision has been discussed in numerous cases and treatises; the revised version, however, which added impersonations of agents, has hardly been addressed by any authority. Clark & Clark, The Law of Bank Deposits, Collections and Credit Cards (1995 and 1998 Supp.), which extensively discusses cases under the old impostor defense provision of § 3-405, has little to say about the effect of the revision. It does seem clear from cases both before and after the revision that someone must still impersonate someone else in order for the impostor defense to apply. There must be an impersonation of an actual agent; a misrepresentation of agency authority is generally not sufficient to invoke the defense.

One of the few cases to discuss the revised impostor defense and to reach this result is *Title Ins. Co. v. Comerica Bank,* 27 Cal. App. 4th 800, 32 Cal. Rptr. 2d 735 (1994). The case involved a son who obtained a loan by falsely representing to a lender that he was his mother's agent by forging a power of attorney. The lender issued a check payable to the mother, and the son forged her endorsement. The California Court of Appeal ruled that even if the case were decided under the revised UCC impostor provision, the defense would not apply because the son never impersonated his mother. The court held that the comment to § 3-404(a) "makes it clear that impersonation is still required to invoke the impostor rule, whether the perpetrator of the deception pretends to be the principal or the agent. Misrepresentation of the perpetrator's agency status does not suffice." 27 Cal. App. 4th at 807 (citing *Intelogic v. Merchants Nat. Bank,* 626 N.E.2d 839, 845 [Ind. App. 1993]).

Another recent case which discusses the revised impostor defense, *Lewis v. Telephone Employees Credit Union,* 87 F.3d 1537, 1550 (9th Cir. 1996), agreed with *Title Insurance* and stated:

"Where a person merely represents that he or she is an agent of an actual existing principal and the check is issued in the name of that principal, it is the bank that bears the loss because it was in the better position to detect a fraudulent indorsement—the bank paid to someone other than an existing principal while the drawer was only tricked about the true powers of the agent."

One case decided under the prior impostor defense provision involved facts very similar to those before us in the present case. In *Clients' Sec. Fund v. Allstate Ins.,* 219 N.J. Super. 325, 530 A.2d 357 (1987), the New Jersey Superior Court held that the impostor rule did not apply to an attorney who forged the signatures of clients on settlement drafts. The court ruled:

"The term 'impostor' refers to 'impersonation' and does not extend to a false representation that the party is the authorized agent of the principal. *Uniform Commercial Code* Comment § 2. . . . 'Impersonation' is the act of pretending or representing oneself to be another. Black's Law Dictionary, (5 ed. 1979) at 679. Such impersonation is of an identity, either real or fictitious, with which the drawer believes he is dealing. [Citation omitted.]
. . . .

"We are satisfied that on the facts before us, the 'impostor rule' is inapplicable. Allstate did not deal with Yucht as an 'impersonator'. Yucht never pretended to be someone other than himself. He always represented that he was the attorney for the claimants: he never claimed to be the clients themselves. It was Allstate's intent to deal with both Yucht and his respective clients and it so issued the settlement drafts. It was Yucht's misrepresentation of fact that his clients had agreed to settle, rather than imposturing, that '. . . induced the maker . . . to issue the instrument[s] to him. . . .' [Citation omitted.] Yucht strengthened this misrepresentation by presenting forged releases to Allstate. There was no intent on Allstate's part that Yucht should supply the indorsements of his clients. The forged indorsements were therefore not rendered 'effective', and thus the loss was not shifted to Allstate as the drawer of the settlement drafts." 219 N.J. Super. at 331-33.

This same reasoning is likewise applicable to the present case, despite the revised version of the impostor defense. Here, although White's misrepresentation of his authority to settle the claims on behalf of King may have induced the insurance companies to issue the drafts, the drafts were not issued to an impostor. The insurance companies made the drafts payable to both White and King and intended King himself, not anyone pretending to be King, to receive the proceeds. The insurance companies did not intend for White to forge King's endorsements, and the forged endorsements may not be deemed effective.

The trial court correctly concluded that the impostor defense of K.S.A. 84-3-404(a) has no application to the facts of this case and Commerce may not invoke its provisions to avoid liability. As the impostor defense is not applicable to this case, we need not discuss the claim made by the insurance companies that the impostor defense should also apply to them as drawees.

*Ratification*

Commerce argues that because King ratified the settlements with the insurance companies, he has also ratified White's forged endorsements on the drafts. Commerce cites a string of cases for the proposition that a principal's election to ratify an unauthorized act requires ratification of the whole act, as a principal may not accept the benefits of the act and reject its burdens. See, *e.g.*, *Adrian v. Elmer*, 178 Kan. 242, 284 P.2d 599 (1955); *Watson v. Woodruff*, 154 Kan. 61, 114 P.2d 864 (1941). King argues White's

unauthorized settlements of two separate claims are separate and distinct from and unrelated to White's subsequent forgery and conversion. We agree with the trial court's conclusion that King's ratification of the unauthorized settlement of the claims does not constitute ratification of White's separate wrongful act of forging King's signatures to the drafts.

White's acts of settling King's claims with the insurance companies were separate and apart from his additional acts of forging King's endorsements on the settlement drafts. This is not a situation where only one act confers both benefits and liabilities. Such might be the case if King wanted to both accept the benefits of the settlements by obtaining the settlement amounts, but reject the burdens, such as the release of all further claims against the insurance companies pertaining to the accident.

Here, however, there are two very distinct acts: obtaining an unauthorized settlement and forging an endorsement. There is no reason why King should not be permitted to ratify one but not the other, especially when we have long held that granting authority to an attorney to handle a lawsuit does not generally confer authority to endorse an instrument on behalf of the client. See *Pearcy v. First National Bank,* 167 Kan. 696, 700, 208 P.2d 217 (1949). The trial court correctly determined that Commerce's position on this issue has no merit. The settlement and the conversion are two separate and distinct transactions.

*Conversion suits against both collecting bank and drawees*

Both Auto-Owners and American Family assert that King has no cause of action against them as drawees on the instruments paid on the forged endorsements because King sued their respective collecting banks, MNB and UMB, as well as Commerce. They essentially rely upon a 1973 California case, *Cooper v. Union Bank,* 107 Cal. Rptr. 1, 507 P.2d 609 (1973), and a pre-UCC Kansas case, *Mackey-Woodard, Inc. v. Citizens State Bank,* 197 Kan. 536, 419 P.2d 847 (1966), to contend that a payee cannot sue both a collecting bank and the drawee for conversion.

These cited authorities provide little support for the insurance companies' position, which also runs counter to the express pro-

visions of K.S.A. 84-3-420 regarding conversion. Further, this argument, which would be an important defense in an action for conversion, has not been mentioned in any recent cases or in the legal commentaries. See, *e.g.*, Clark, ¶ 12.03.

In addition, we point out that *Mackey-Woodard* merely holds that a plaintiff must elect his or her remedies and can either pursue a tort action for conversion or a contract action to recover proceeds. If a plaintiff chooses the latter, the plaintiff loses the right to recover against the drawer and drawee because he or she has thereby ratified the payment to the collecting bank. The case does not hold, however, that if the plaintiff chooses to pursue a conversion action, he or she is deemed to have ratified the payment of the proceeds and cannot sue the drawee.

The insurance companies appear to suggest their argument has more merit when collecting banks are sued in addition to the depository bank and drawee. Insofar as their argument is premised on this distinction, it lacks any merit under the facts of this case. UMB and MNB were never sued in their capacity as collecting banks and were dismissed from the suit when it was determined they were not the drawees of the drafts, but merely payable through banks.

We hold that a suit for conversion against the collecting bank does not prohibit a claim also being made against the drawees.

*Conversion liability of nonbank drawees*

Auto-Owners next makes the argument that the revised version of the UCC eliminates the conversion liability of a nonbank drawee. The prior provision on conversion liability, K.S.A. 84-3-419(1) (Ensley 1983), stated that an instrument was converted if it was paid on a forged endorsement. K.S.A. 84-3-420(a) now provides that a conversion occurs when "a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment."

Auto-Owners cites no authority in support of its interpretation of the effect of the revision. Nothing in the comments to the section remotely implies that the intended effect was to remove conversion liability from nonbank drawees, nor do the authorities dis-

cussing the new revision comment upon this possibility. Furthermore, Auto-Owners claims that all cases holding nonbank drawees liable relied upon the old provision. However, the 1998 supplement to Clark's treatise does again specifically discuss the issue of when an insurance company plays a dual role as both drawer and drawee and cites two recent cases where insurance company drawees were held liable for conversion, although both relied upon UCC 3-419(1)(c). See *Mandelbaum v. P&D Printing*, 279 N.J. Super. 427, 652 A.2d 1266 (1995); *Glazer v. First American Nat. Bank*, 930 S.W.2d 546 (Tenn. 1996). Clark did not discuss how the revision could have changed the result in such cases.

We do not believe the Kansas Legislature, by enacting the revised code, intended to change established law permitting a conversion action by an intended payee against a nonbank drawee who paid on a draft with a forged endorsement. K.S.A. 84-3-420(a) does not discuss who is liable for the conversion, but merely defines what a conversion is. Further, the Official UCC Comment 2 to 84-3-420 discusses how the former 84-3-419 was amended "because it is not clear why the former law distinguished between the liability of the drawee and that of other converters." This implies that all drawees should be treated as converters in a forged endorsement case such as this, and nothing in this comment indicates that nonbank drawees should be considered a special case apart from other converters.

We refuse to adopt the defense suggested by Auto-Owners and rule that the revised Article 3 does not prohibit actions for conversion against nonbank drawees.

*Recovery for draft payable to wife's estate*

American Family claims that King has no standing to sue for conversion of a check made payable to the Estate of Judy King; however, this precise issue was never raised to the trial court. At the hearing in which the court pronounced judgment, American Family noted:

"American Family's position is that Jerry King, as the heir-at-law, could have ultimately obtained a portion of the proceeds of the settlement, if not all of them,

and that's why he elected to sue for the proceeds. I think he has a valid claim to the proceeds, but he doesn't have a valid claim to the instrument."

This statement provides no real indication that American Family was arguing that King had no standing in this suit.

We follow our general rule that an issue not raised before the trial court cannot be raised for the first time on appeal. *Ripley v. Tolbert*, 260 Kan. 491, Syl. ¶ 6, 921 P.2d 1210 (1996). Furthermore, when American Family originally authorized payment, the settlement draft only contained King's forged signature, not a signature of King on behalf of his wife's estate. American Family obviously intended for King to receive the proceeds of the check or it would not have approved the payment on the forged endorsement of his name. This point has no merit.

*Agent's wrongful conduct*

American Family argues that King should bear the loss in this transaction because he choose to deal with a dishonest agent, citing only *Cairo Cooperative Exchange v. First Nat'l Bank of Cunningham*, 4 Kan. App. 2d 458, 608 P.2d 1370, *aff'd in part and rev'd in part* 228 Kan. 613, 620 P.2d 805 (1980).

This case provides no authority for American Family's position, as the result was clearly based on the provisions of K.S.A. 84-3-405(1)(b) (Ensley 1983) (now 84-3-404[b]), dealing with fictitious payees, and American Family's argument removes the case's holdings from that context. *Cairo Cooperative* does not alter any of the established liabilities of Article 3 of the UCC and is not applicable to the facts of this case. There is no justification for holding King liable for White's wrongful conduct under the facts of this case.

*Contingency fee—King's cross-appeal*

K.S.A. 84-3-420(b) provides:

"(b) In an action under subsection (a) [conversion], the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument."

Due to this provision and the determination that King and White had entered into a contingency fee agreement, the trial court concluded that Commerce and the insurance companies were only

liable for King's two-thirds share of the proceeds of the settlement checks. King argues first that disputed facts remained pertaining to the scope of his representation agreement with White and second that due to White's reprehensible conduct, he forfeited any interest in the draft.

King contends he has found no case where an attorney engaged in wrongful conduct was awarded a fee. He argues public policy should prevent an attorney who steals from his client from being permitted to collect a fee. King cites an unpublished federal district court case involving White before Judge Van·Bebber, *Wilmer, Jr. v. Board of County Comm'rs*, (D. Kan. No. 91-2265 1997), where the court determined that the reasonable fee to which White was entitled was nothing, due to his objectionable conduct.

This argument is countered by Commerce and the insurance companies that the *Wilmer* opinion is unpublished, not of precedential value, and between attorney and client, not involving third parties. Their strongest argument is the change in the wording of K.S.A. 84-3-419(2) (Ensley 1983), which read: "[T]he measure of the drawee's liability [in a conversion action] is the face amount of the instrument." The revised conversion statute, K.S.A. 84-3-420, now provides in subsection (b) that "recovery may not exceed the plaintiff's interest in the instrument."

Under the provisions of K.S.A. 84-3-420(b), it is clear that King should only be permitted to recover his interest in the instrument, although that interest is still presumed to be the face amount of the draft. See Clark, ¶ 12.03[1], p. 12-8. Thus, we must determine what King's present interest in the draft is, which requires us to decide if White retained a valid interest.

The trial court did not analyze this last question beyond concluding that because an oral fee agreement had been entered into, White was automatically entitled to a one-third contingency fee. We deem this analysis insufficient, especially considering that the scope of the purported representation agreement may not have included any settlements with the automobile insurance carriers.

While we ultimately resolve this issue by relying on the breach of the employment agreement by an attorney who literally steals from his client, we look briefly to the wording change in the UCC

provisions quoted above. It seems clear the intent was to reduce the ultimate liability of the party accepting the forged endorsement as the wording went from "face amount of the instrument" to "plaintiff's interest in the instrument."

Cases regarding this issue in Annot. 47 A.L.R.3d 537, § 8[b] and [c] (1973 and supplement) looked to the wording of UCC 3-419(2) to set damages at the face amount, even when it appeared the nonsigning payee's interest was a lesser amount. A case very similar to the one before us is *Hoppe v. First Midwest Bank of Poplar Bluff*, 899 S.W.2d 879 (Mo. App. 1995), which involved an attorney's forgery of a check payable to a client. Under UCC 3-419(2), the court allowed recovery for the face amount of the check. The provisions of UCC 3-420(b) were not considered, although the New Jersey case of *Nutt v. Chemical Bank*, 231 N.J. Super. 57, 555 A.2d 8 (1989), was deemed to be similar as to the attorney fees issue, and the *Hoppe* court noted in a footnote:

"Complete forfeiture of attorney fees occurs when an attorney's 'willfully blameworthy' conduct clearly and seriously violates the attorney's duties and thereby destroys the attorney-client relationship. *International Materials Corp. v. Sun Corp., Inc.*, 824 S.W.2d 890, 895 (Mo. banc 1992)." 899 S.W.2d at 883 n.4.

If we were to determine that White's fee was lawfully earned and rightfully payable, then the revised wording of 84-3-420(b) might justify a result different from that which we reach herein, but such is not the case based on the clear evidence of White's actions.

Attorneys who act unscrupulously towards the interests of their clients are not entitled to compensation. One authority, 7 Am. Jur. 2d, Attorneys at Law § 279, Fidelity and professional competence, provides:

"A lawyer who does not at all times represent the client with undivided fidelity is not entitled to compensation for his or her services . . . .

"An attorney who is guilty of actual fraud or bad faith toward a client, or who seeks to secure his or her personal advantage to the prejudice of the client, is not entitled to any compensation for his or her services. Nor can the attorney recover for services rendered in violation of the requirements of professional responsibility."

This rule is further supported in 3 Am. Jur. 2d, Agency § 258, Effect of agent's fraud, misconduct, or disobedience:

"An agent may lose his rights to commissions or other compensation if, in his dealing in reference to the subject matter of his employment, he is guilty of either fraud or bad faith toward his employer. . . .

. . . .

". . . An agent must act within the terms of his authority, and a substantial variance therefrom defeats his right to compensation . . . ."

We hold White is not entitled to any fee for his services in obtaining the settlement agreements, regardless of whether they inured to King's benefit through his ratification of the settlements. White's wrongful conduct is a breach of his employment contract, and his actions result in the forfeiture of any right to attorney fees such that he had absolutely no interest in the settlement drafts at the time he forged King's signatures and feloniously negotiated the instruments.

This result corresponds with decisions in other cases where 84-3-420(b) of the UCC is applied, where it appears the determination of the claimant's interest in a converted draft is made as of the time of trial rather than at the time the draft is drawn.

As White has no right to claim a fee from King, he has no interest to claim in the settlement drafts. Therefore, King has the right to claim the entire amount of the drafts and is entitled to a judgment of $50,000 against Commerce and, in the alternative, $25,000 against each of the insurance companies. Commerce and the insurance companies are jointly and severally liable pursuant to K.S.A. 84-3-116(a), and each is entitled to contribution under K.S.A. 84-3-116(b).

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded for entry of judgment as directed by this opinion.

SIX and DAVIS, JJ., not participating.

GARY W. RULON, J., and E. NEWTON VICKERS, Senior Judge, assigned.